KAEMPFER CROWELL
Louis M. Bubala, III, No. 8974
Bryan M. Viellion, No. 13607
1980 Festival Plaza Drive, Suite 650
Las Vegas, Nevada 89135
Telephone: (702) 792-7000
Facsimile: (702) 796-7181
Email: lbubala@kcnvlaw.com
Email: bviellion@kcnvlaw.com

*Electronically Filed*
*November 19, 2019*

Attorneys for Fashion Show Mall, LLC

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

In re:

JOSHUA MICHAEL GRANTZ,

Debtor.

Case No. BK-S-09-22832-abl
Chapter 7

**FASHION SHOW MALL, LLC'S OPPOSITION TO MOTION FOR VIOLATION OF ORDER REOPENING CASE/DISCHARGE INJUNCTION**

Hearing Date: 11/21/19
Hearing Time: 9:30 a.m.

Fashion Show Mall, LLC opposes Debtor's Motion for Contempt Against Fashion Show Mall, LLC for Violation of Order Reopening Case/Discharge Injunction ("Motion," ECF No. 64).

## I. INTRODUCTION

Debtor failed to discharge his liability under the personal guaranty when he excluded Fashion Show from his bankruptcy. Debtor admits he did not provide Fashion Show[1] with notice of his bankruptcy in order for Fashion Show to timely file a proof of claim. Debtor admits, and his bankruptcy docket shows, the trustee administered assets in his case. Therefore, under the plain reading of the Bankruptcy Code, Debtor's liability under the personal guaranty to Fashion Show

---

[1] Fashion Show Mall, LLC is the successor in interest to Rouse F.S., LLC, the original landlord and beneficiary of Debtor's personal guaranty of the Lease. For the purposes of this Opposition, Fashion Show and Rouse can be used interchangeably.

was excepted from his discharge. Debtor's legally irrelevant amendment to Schedule G, Executory Contracts and Unexpired Leases, five years later does not retroactively apply his discharge to Fashion Show.

As Debtor's liability to Fashion Show under the personal guaranty was excepted from his discharge, Fashion Show could not have violated the discharge injunction by obtaining and enforcing a judgment against Debtor on account of such liability. Therefore, Debtor's Motion should be denied.

## II.    RELEVANT FACTS

1. On June 6, 2003, Talulah G, Inc. d/b/a Talulah G ("Tenant") entered into a lease agreement ("Lease") with Fashion Show Mall, LLC's predecessor in interest to Rouse F.S., LLC. A copy of the Lease is attached as Exhibit A.

2. On the same day the Lease was executed, Debtor executed a personal guaranty ("Guaranty") guarantying Tenant's obligations under the Lease. A copy of the Guaranty is attached as Exhibit B.

3. On July 19, 2009, Debtor filed for Chapter 7 bankruptcy. ECF No. 1

4. Debtor failed to schedule his liability to Rouse F.S. under the Guaranty on either Schedule F, Creditors Holding Unsecured Nonpriority, or Schedule G, even though disclosure of unexpired leases do not provide for the disclosure of a debtor's liability as a guarantor of a non-debtor's lease. *Id*. at 18-21; *See also* ECF No. 64, Debtor's Motion for Contempt at 1:24-26.

5. Debtor further failed to list Rouse F.S. on the bankruptcy creditor matrix. ECF No. 1.

6. On February 19, 2010, the Court entered an Order Discharging Debtor. ECF No. 26.

7. On April 2, 2010, the Chapter 7 Trustee filed a Notice of Assets and Notice to File

Claims in Debtor's bankruptcy case.  ECF No. 29

8.    The Trustee set the proof of claim bar date for July 1, 2010.  *Id.*

9.    The Trustee administered a total of $2,247.70 in estate assets.  ECF No. 39

10.    On January 25, 2013, ***almost three years after the proof of claim bar date***, Fashion Show, as successor in interest to Rouse F.S., filed suit against, among others, Debtor on account of a breach of the Guaranty.  A copy of the filed Complaint is attached as Exhibit C.

11.    At the time of the suit, Fashion Show had not received notice of Debtor's bankruptcy and the time to file claims expired almost three years prior.

12.    The first time Fashion Show became aware of Debtor's bankruptcy was on February 1, 2013, when Debtor's ex-wife and co-guarantor emailed Fashion Show's counsel upon receipt of the District Court Complaint and copied Debtor on the email.  A copy of the February 1, 2013 email is attached as Exhibit D at pp 8-9.

13.    On February 5, 2013, and at Debtor's request, Fashion Show's counsel emailed a copy of the Complaint filed in District Court to Debtor.  A copy of the February 5, 2013 email is attached as Exhibit D at p. 3.

14.    Debtor failed to appear in the proceeding and Fashion Show obtained a default judgment against Debtor on October 24, 2013, which Fashion Show recorded in Clark County, Nevada on October 29, 2013 as Instrument #201310290003165.  A copy of the recorded Judgment is attached as Exhibit E.

15.    On April 22, 2015, ***over two years after Debtor had knowledge of the Complaint***, Debtor requested this Court re-open his bankruptcy case to amend his schedules to add Rouse F.S., LLC to Schedule G.  ECF No. 49.

16.    On April 23, 2015, this Court re-opened Debtor's bankruptcy case.  ECF No. 51.

17.    On June 4, 2015, Debtor amended Schedule G to include Rouse F.S., LLC.  ECF

No. 55.

18.　　　Debtor did not amend his Schedule F.

19.　　　After Debtor amended his Schedule G, Debtor took no other action in his re-opened bankruptcy (including challenging the liens Fashion Show asserted against his real property after obtaining judgment) and the estate was administratively closed, again, on February 8, 2016.  ECF No. 58.

20.　　　Debtor did not receive a new or amended discharge which would have included the debt owed to Fashion Show on account of the Lease.

## III.    LEGAL ARGUMENT

Section 523(a)(3)(A) excepts from discharge unscheduled debts where the creditor had no notice of the bankruptcy in order to timely file a proof of claim.  11 U.S.C. § 523(a)(3)(A); *In re Mahakian*, 529 B.R. 268, 275 (B.A.P. 9th Cir. 2015) ("The language contained in § 523(a)(3)(A) is clear and not ambiguous: a debt is excepted from discharge if the creditor was neither listed nor scheduled and did not otherwise know of the bankruptcy case in time to file a timely POC.").  Courts should not interpret the language contained in § 523(a)(3)(A), but rather "enforce the statute according to its terms."  *Id.* (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)).  In other words, if the elements under § 523(a)(3)(A) are met, the Court should find that the debt was excepted from a debtor's discharge.  *Id.* (holding the unscheduled creditor's debt excepted from discharge where the "undisputed facts show that debtor did not list or schedule the debt owed to [creditor] prior to the claims bar date and that [creditor] did not have notice or actual knowledge of the case in time to file a timely [proof of claim].")

The facts in *Mahakian* are illustrative in this case.  In that case, the debtor acknowledged he failed to list the creditor on his schedules such that the creditor did not receive notice of the bankruptcy in order to file a timely proof of claim.  *Id.* at 271.  The trustee filed a notice of assets

and proof of claim bar date for the filing of claims. *Id*. Shortly after the proof of claim bar date, the debtor learned that he failed to schedule a creditor. *Id*. Debtor amended his Schedule F to include the omitted creditor, but the amendment occurred roughly four (4) months after the proof of claim bar date. *Id*. After amending his Schedule F, debtor also served the creditor with a § 341 meeting notice and filed a proof of claim for the omitted creditor, albeit untimely. *Id*. at 271-72. The Court held that the plain language of § 523(a)(3)(A) is clear and, therefore, the unscheduled debt was not dischargeable because it did not afford the omitted creditor notice of the bankruptcy in time to file a proof of claim. *Id*. at 277 ("We have previously stated that the court has no power to disregard the clear language of § 523(a)(3)(A). Although application of the plain text of § 523(a)(3)(A) may lead to harsh results, courts may not soften the import of Congress' chosen words." (internal citations omitted)).

Here, Debtor undisputedly failed to include Fashion Show in his bankruptcy schedules. Debtor does not dispute Fashion Show was unaware of Debtor's bankruptcy in time for it to timely file a proof of claim. Almost three years after the proof of claim bar date, Debtor amended his Schedule G under the erroneous belief that doing so would discharge the unscheduled debt of Fashion Show. Just as the court did in *Mahakian*, this Court should find that the Debtor's liability to Fashion Show was not discharged under the plain language of § 523(a)(3)(A) despite the harsh results for Debtor. Therefore, the Court should deny Debtor's Motion.

### 1. The Limited "No Asset" Exception to Section 523(a)(3)(A) Does Not Apply as the Trustee Administered Estate Assets to Creditors

Unlike in a case where estate assets are administered, the exception to discharge under Section 523(a)(3)(A) is not triggered in a "no asset" case since a proof of claim deadline is not set. *In re Beezley*, 994 F.2d 1433, 1436 (9th Cir. 1993) (per curiam, Judge O'Scannlain concurrence, "The critical point here is that in most cases filed under Chapter 7 (i.e., no asset, no bar date cases),

1   the date to file claims is never set and thus § 523(a)(3)(A) is not triggered.") (internal quotations

2   omitted).  In other words, all of the elements cannot be met to except a debt from discharge under

3   Section 523(a)(3)(A) in a no asset case.  *Id*.  ("That is, in a no asset, no bar date case, section

4   523(a)(3)(A) is not implicated because there can never be a time when it is too late to permit

5   timely filing of a proof of claim.")

6       Debtor's argument is, notwithstanding the plain language of the statute, that the Court

7   should extend *Beezley* to asset cases but where there is a recovery only for priority creditors.  ECF

8   No. 64 at 3:18-21.  This argument fails because the plain and unambiguous statutory language

9   makes no such distinction between priority and unsecured claims.  11 U.S.C § 523(a)(3)(A); *see*

10  *Connecticut National Bank v. Germain*, 503 U.S. 249, 253-254 (1992) (stating that "in interpreting

11  a statute a court should always turn first to one, cardinal canon before all others.  We have stated

12  time and again that courts must presume that a legislature says in a statute what it means and

13  means in a statute what it says there."); *In re Kane*, 336 B.R. 477, 486 (Bankr. D. Nev. 2006)

14  ("[T]here is a strong and longstanding view that the words of a statute are supreme and, if they are

15  clear, they should be taken as fully embodying what the legislature intended.  If the text is not

16  ambiguous, that is the end of the inquiry."); *Ron Pair*, 489 U.S. at 242 ("The plain meaning of

17  legislation should be conclusive, except in the rare cases in which the literal application of a statute

18  will produce a result demonstrably at odds with the intentions of its drafters.") (quotation and

19  citation omitted).

20      The limited exception to § 523(a)(3)(A) explained in *Beezley* does not apply to an asset

21  case.  *Mahakian*, 529 B.R. at 276 (finding "the actual holding of *Beezley* is irrelevant to an asset

22  case such as this").  Debtor's attempt to argue that Fashion Show was not prejudiced since estate

23  distributions were only made to priority creditors contradicts the plain language of § 523(a)(3)(A)

24  which makes no such distinction between classes of claimants.  ECF No. 64 at 3:20-21.  A

1    bankruptcy court cannot read into § 523 equitable considerations to determine if an unscheduled

2    debt is dischargeable under § 523(a)(A)(3).  *Id.* at 277 ("Taken together, Judge O'Scannlain's

3    observations support a plain reading of § 523(a)(3)(A) which does not contain any equitable

4    exceptions.").

5         The Courts in *Beezley* and in *Mahakian* confirm that the clear language of § 523(a)(3)(A)

6    must be followed excepting from discharge unscheduled debts which do not provide a creditor

7    notice of the bankruptcy in order to file a proof of claim.  *Id.* ("Courts are not free to condition the

8    relief Congress has made available in the Bankruptcy Code on factors Congress has deliberately

9    excluded from consideration.").  *Beezley* cannot be extended to Debtor's asset case on grounds that

10   only priority claims received distributions, and the Court should deny Debtor's Motion.

11        **2.    Reopening a Bankruptcy Case to Add an Omitted Creditor Does Not Affect
               the Dischargeability of a Previously Unscheduled Debt.**

12

13        Debtor's argument that reopening a bankruptcy case applies his discharge to a previously

14   omitted creditor (ECF No. 64 at 5:3-4) also fails under the plain language of § 523(a)(3)(A).

15   "Reopening a case in order to add an omitted creditor will not result in relief being afforded to a

16   debtor because, unless the creditor had actual notice of the bankruptcy, pursuant to 11 U.S.C. §

17   523(a)(3) the omitted debt will not be discharged."  *In re Bowen*, 102 B.R. 752, 753–54 (B.A.P.

18   9th Cir. 1989).  As the leading bankruptcy treatise observes, Debtor's mistaken belief that merely

19   reopening his bankruptcy and amending his schedules would effectuate a discharge of the omitted

20   debt is a classic misconception.  3 Collier on Bankruptcy § 350.03[2] (Richard Levin & Henry J.

21   Sommer eds., 16th ed.).   Under § 523(a)(3), a nonscheduled debt is excepted from debtor's

22   discharge simply if the failure to schedule resulted in the creditor lacking knowledge of the case in

23   time to file a proof of claim.  *Id.*  Here, it is undisputed by Debtor that Fashion Show did not have

24   notice until well after the proof of claim bar date of July 1, 2010.

1   As Judge O'Scannlian stated in his concurrence in *Beezley*, "[e]ither the debt was long ago

2   discharged by the operation of sections 523 and 727 or it was not."  944 F.2d at 1437.  The debt to

3   Fashion Show was not.  Rather, it was excepted from Debtor's discharge under § 523(a)(3)(A)

4   since Debtor undisputedly failed to provide Fashion Show notice of his bankruptcy, and Fashion

5   Show did not have notice of his bankruptcy in order to timely file a proof of claim by July 1, 2010.

6   Therefore, Debtor reopening his case to add Fashion Show to Schedule G ***five years after*** his

7   discharge and almost ***five years after*** the proof of claim deadline passed was legally irrelevant and

8   did not discharge Debtor's liability to Fashion Show.  Thus, the Court should deny Debtor's

9   Motion.

10          **3.  Fashion Show Possessed a Fair Ground for Doubt that its Debt was Excepted
                 from Debtor's Discharge Making Sanctions Inappropriate.**

11

12   As discussed above, the re-opening of the Chapter 7 case and the Debtor's belated

13   scheduling of Fashion Show as a creditor after the case had been closed for five years and the

14   proof of claim bar date had long since passed has no effect on whether the debt is discharged.

15   *Mahakian, supra; see also* 11 U.S.C. §523(a)(3).  Debtor acknowledges that its own legal position

16   relies not on direct authority but, rather, an extension of existing case authority regarding "no

17   asset" Chapter 7 cases to cases that result in distributions to priority, but not unsecured, creditors.

18   ECF No. 64 at 3: 12-21. As further addressed above, such assertion is contrary to the plain

19   meaning of Section 523(a)(3).

20   Given this, Fashion Show's objectively reasonable basis for concluding the discharge

21   injunction did not apply to discharge the debt owed to it precludes sanctions against Fashion Show.

22   Earlier this year, the Supreme Court clarified that a Court should not hold a creditor in civil

23   contempt if an objectively reasonable basis of lawful conduct exists for a violation of the discharge

24   injunction.  *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1799 (2019) (holding "a court may hold a

creditor in civil contempt for violating a discharge order if there is no fair ground of doubt as to whether the order barred the creditor's conduct.  In other words, civil contempt may be appropriate if there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful.")

Debtor misstates the standard for civil contempt in a bankruptcy proceeding, asserting that Fashion Show essentially has "strict liability" for violating a discharge injunction, citing *Walls v. Wells Fargo Bank*, 267 F.3d 502, 507 (9th Cir. 2002).  ECF No. 64 at 4: 20-22.   The Supreme Court did away with the "strict liability" standard in favor of the "no fair ground of doubt" standard in *Taggart*.  139 S. Ct. at 1799.

Here, Fashion Show contends that Debtor's failure to schedule it as a creditor and the chapter 7 Trustee's Notice to File Proof of Claims triggered application of Section 523(a)(3), rendering Debtor's obligations to Fashion Show nondischargeable, irrespective of the belated re-opening of the case.  Fashion Show relies on a straightforward, "plain meaning" application of the statute, while Debtor bases his contention on an unwarranted extension of existing case law. Under such circumstances, even if Fashion Show is ultimately incorrect, there is "fair ground for doubt" under the *Taggart* standard and contempt sanctions are not appropriate.

## IV.    CONCLUSION

Debtor failed to schedule Fashion Show as a creditor in his bankruptcy.  Fashion Show did not receive notice of Debtor's bankruptcy prior to the July 1, 2010 proof of claim bar date to timely file a proof of claim.  All of the elements under § 523(a)(3)(A) have been met to except Debtor's liability under the Guaranty from discharge.  The Court should deny the Motion.

November 19, 2019                        KAEMPFER CROWELL

By:    */s/ Bryan M. Viellion*
Louis M. Bubala, III, No. 8974
Bryan M. Viellion, No. 13607
Attorneys for Fashion Show Mall, LLC

1

## CERTIFICATE OF SERVICE

2          Pursuant to FRBP 7005 and FRCP 5(b), I certify that I am an employee of Kaempfer
Crowell, that I am over the age of 18 and not a party to the above-referenced case, and that on

3     November 19, 2019 I filed and served the foregoing **FASHION SHOW MALL, LLC'S
OPPOSITION TO MOTION FOR VIOLATION OF ORDER REOPENING
CASE/DISCHARGE INJUNCTION** as indicated:

4

5  __X__   **BY NOTICE OF ELECTRONIC FILING**: through Electronic Case Filing System of the
United States Bankruptcy Court, District of Nevada, to the individuals and/or entities at
their email addresses as set forth in the notice of electronic filing.

6

7          I declare under penalty of perjury that the foregoing is true and correct.

8          DATED:  November 19, 2019.

                                        _/s/   Merrilyn Marsh_____
9                                        An Employee of KAEMPFER CROWELL

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT A

# EXHIBIT A

(May 22, 2003)

JUN 0 6 2003

Sent to Mall: _____

Verified _____

# LEASE AGREEMENT

by and between

ROUSE F.S., LLC

(Landlord)

and

TALULAH G, INC.

t/a TALULAH G

(Tenant)

(May 22, 2003)

## LEASE AGREEMENT

JUN 0 6 2003

THIS LEASE AGREEMENT ("Lease") dated
by and between ROUSE F.S., LLC, a Maryland limited liability company ("Landlord"), and TALULAH G, INC., a Nevada corporation, t/a TALULAH G ("Tenant").

## W I T N E S S E T H :

FOR VALUABLE CONSIDERATION Landlord and Tenant agree as follows:

## ARTICLE I
## DEFINITIONS AND ATTACHMENTS

Section 1.1.    Certain Defined Terms.

As used herein, the term:

A.    "Landlord's Property" means the certain parcel or parcels of land owned, leased or controlled by Landlord located in Clark County, Nevada which property comprises all or a portion of the Project and upon the opening for business with the public, any additional property used for expansion or addition.

B.    "Project" means (i) Landlord's Property, (ii) the adjacent parcel or parcels of land not owned, leased or controlled by Landlord but which are operated as an integral part of the project known as Fashion Show, and, (iii) upon the opening for business with the public, any additional property used for expansion or addition.

C.    "Landlord's Building" means the improvements constituting the main mall building constructed or to be constructed by Landlord or others on Landlord's Property, intended to be leased to retail tenants as the same may be altered, reduced, expanded or replaced from time to time.

D.    "Premises" means Tenant's portion of Landlord's Building shown on Schedule "A" having the following area: 1,847 square feet.

E.    "Outside Commencement Date" means October 1, 2003.

"Termination Date" means September 30, 2013

"Initial Marketing Contribution" means the product of the following figure multiplied by Tenant's Floor Area:  $3.00.  See Article XI..

-1-

(May 22, 2003)

F.      "Permitted Use" means the sale at retail of designer apparel, jewelry, shoes, belts and handbags including, but not limited to, the following featured designers; Chlo'e, Marc by Marc Jacobs, Paul Smith, Lacoste, Vanessa Bruno, Paco Rabanne, Imitation of Christ, Seven for all Mankind, Paper Denim, Jiwon Park, Markus Lupser, Siegerson Morrison and Kors by Micheal Kors.

G.      "Annual Basic Rental" means an amount equal to the product of the following applicable figure multiplied by Tenant's Floor Area:

| | |
|---|---|
| Rental Years 1 - 4: | $50.00 |
| Rental Years 5 - 8: | $60.00 |
| Rental Years 9 - Termination Date: | $70.00 |

H.      "Annual Percentage Rental" means a sum equal to six percent (6%) of the amount by which annual Gross Sales exceed the product of the following applicable figure multiplied by Tenant's Floor Area (the "Breakpoint"), subject to adjustment as provided in Section 5.1; provided, however, that in the event during the first or last Rental Year Tenant is not open for business for twelve (12) full months, the Breakpoint shall be an amount equal to the Breakpoint specified herein multiplied by a fraction, the numerator of which shall be the actual number of complete months during which Tenant was open for business during the Rental Year and the denominator of which shall be twelve (12):

| | |
|---|---|
| Rental Years 1 - 4: | $833.33 |
| Rental Years 5 - 8: | $1,000.00 |
| Rental Years 9 - Termination Date: | $1,166.67 |

I.      "Tenant's Occupancy Charge" means an annual amount equal to the product of the following figure multiplied by Tenant's Floor Area:  $24.91, as adjusted pursuant to Section 5.1.

J.      "Tenant Notice Address" means

        2951 De Silva Drive
        Las Vegas, NV 89121
        Attn.: Joshua Grantz

K.      "Tenant Trade Name" means TALULAH G which Tenant represents it is entitled to use pursuant to all applicable laws.

L.      "Store Hours" means Monday through Friday 10:00 a.m. to 9:00 p.m.; Saturday 10:00 a.m. to 7:00 p.m.; and Sunday 12:00 Noon to 6:00 p.m.

M.      "Restriction Area" means two (2) miles for the first four (4) years of the Term and none thereafter.

N.      "Landlord's Floor Area" means the aggregate number of square feet of leasable floor area in Landlord's Building (exclusive of Anchors and exclusive of any floor area not structurally connected to Landlord's Building or not having an opening into the enclosed mall) which,

-2-

with respect to any such floor area which has been leased to any rent-paying tenant, shall be determined in accordance with the provisions of any lease applicable thereto and which, with respect to any such floor area not so leased, shall consist of all such leasable floor area in Landlord's Building designed for the exclusive use and occupancy of rent-paying tenants, which shall exclude Common Areas, storage areas leased separately from retail areas, mezzanine areas and areas used for Landlord's management and promotion offices.

O.    "Tenant's Floor Area" means the number of square feet contained in that portion of Landlord's Floor Area constituting the Premises which shall be measured (a) with respect to the front and rear width thereof, from the exterior face of the adjacent exterior or corridor wall or, if none, from the center of the demising partition, to the opposite exterior face of the adjacent exterior or corridor wall or, if none, to the center of the opposite demising partition, and (b) with respect to the depth thereof, from the front lease line to the exterior face of the rear exterior wall, or corridor wall, or, if neither, to the center of the rear demising partition; and in no case shall there be any deduction for columns or other structural elements within any tenant's premises.

P.    "Common Areas" means those areas and facilities which may be furnished from time to time by Landlord or others in or near Landlord's Property for the non-exclusive general common use of tenants, Anchors and other occupants of the Project and their agents, employees and customers.

Q.    "Default Rate" means an annual rate of interest equal to 2% above the "prime rate".  The "prime rate" is an annual percentage rate published by The Wall Street Journal in its Money Rates as of the first business day in January of the year(s) for which the Default Rate applies.

R.    "Anchor" means any tenant or other occupant of the Project which either (i) occupies a floor area in excess of 50,000 square feet in the Project, or (ii) occupies a floor area in excess of 25,000 square feet and is designated an Anchor in a notice to that effect given by Landlord to Tenant.

"Major Tenant" means any tenant or other occupant of the Project which occupies a floor area of at least 20,000 square feet in the Project.

S.    "Landlord's Leased Floor Area" means the monthly average of the aggregate number of square feet of Landlord's Floor Area leased to tenants (including the Premises) as of the first day of each calendar month during the billing period in question.  (If used, this term appears only in Schedule D.)

Section 1.2.    Additional Defined Terms.

The following additional terms are defined in the places in this Lease noted below:

| Term | Section |
|---|---|
| "Additional Rental" | 5.1 |
| "Casualty" | 14.1 |
| "Commencement Date" | 3.1 |
| "CPI" | 5.1 |
| "Electricity Component" | Schedule C (if applicable) |
| "Electricity Factor" | Schedule C (if applicable) |
| "Environmental Laws" | 8.4 |

- 3 -

(May 22, 2003)

| | |
|---|---|
| "Event of Default" | 17.1 |
| "Expansion" | 5.6 |
| "Fiscal Year" | Schedule D (if applicable) |
| "Force Majeure" | 3.1 |
| "Future Rental Damages" | 17.3 |
| "Gross Sales" | 5.2 |
| "Hazardous Material(s)" | 8.4 |
| "HVAC Factor" | Schedule D (if applicable) |
| "Mortgage" | 18.1 |
| "Mortgagee" | 18.1 |
| "Qualified Rental" | 5.5 |
| "Rental" | 5.1 |
| "Rental Year" | 5.1 |
| "Tax Year" | 6.1 |
| "Taxes" | 6.1 |
| "Tenant's HVAC Charge" | Schedule D (if applicable) |
| "Tenant's V/CW Charge" | Schedule D (if applicable) |
| "Term" | 3.1 |
| "Termination Damages" | 17.3 |
| "Transfer" | 16.1 |
| "Transferee" | 16.1 |
| "Umpire" | Schedule C (if applicable) |
| "V/CW Factor" | Schedule D (if applicable) |

Section 1.3.    <u>Attachments</u>.

The following documents are attached hereto, and such documents, as well as all drawings and documents prepared pursuant thereto, shall be deemed to be a part hereof:

| | | |
|---|---|---|
| Schedule "A" | - | Drawing of Landlord's Property including Landlord's Building and Tenant's Premises |
| Schedule "B" | - | None |
| Schedule "C" | - | Utility Consumption and Payment Schedule |
| Schedule "D" | - | Tenant Heating, Ventilating and Air-Conditioning Schedule |
| Exhibit "1" | - | Estoppel Certificate |
| Guaranty | | |
| Subordination, Non-Disturbance and Attornment Agreement | | |

ARTICLE II
<u>PREMISES</u>

Section 2.1.    <u>Demise</u>.

Landlord hereby leases to Tenant and Tenant hereby rents from Landlord, the Premises having the floor area set forth in Section 1.1.D.  Landlord warrants that it has the right to lease the Premises hereby demised, and that so long as Tenant is not in default hereunder, Tenant shall have peaceful and quiet use and possession of the Premises, subject to any Mortgage, and all matters of record or other agreements to which this Lease is or may hereafter be subordinated.  Upon the election of either Landlord or Tenant upon delivery

-4-

(May 22, 2003)

of the Premises to Tenant, but prior to Tenant's installation of its improvements, the Premises shall be remeasured by Landlord, at the sole cost and expense of the party electing such measurement, using the formula set forth in Section 1.1.O. hereof. If the total area of the Premises is found to be less than or greater than the area as set forth in Section 1.1.D., then Landlord and Tenant shall execute an amendment to this Lease to correct the discrepancy in the total area of the Premises, for all purposes of this Lease. If neither party elects a remeasurement upon delivery of the Premises to Tenant, the floor area stated in Section 1.1.D. shall be deemed accepted by the parties hereto for all purposes of this Lease.

ARTICLE III
TERM

Section 3.1.    Term.

The term of this Lease (the "Term") shall commence on that date (the "Commencement Date") which shall be the earlier to occur of (a) the Outside Commencement Date or (b) the opening by Tenant of its business in the Premises, and shall terminate on the Termination Date; provided, however, if Tenant's alterations are delayed by Force Majeure (as hereinafter defined), then the Outside Commencement Date and the Termination Date shall be extended for the period of such delay, not to exceed thirty (30) days, provided (i) Tenant provides prompt notice to Landlord of such Force Majeure, (ii) Tenant uses its diligent efforts to complete said alterations, and (iii) Tenant has otherwise complied with this Lease. "Force Majeure" shall be failure of power, restrictive governmental law or regulations, riots, insurrection or war, Acts of God, Casualty, strikes or lockouts (provided, however, financial inability shall not constitute a Force Majeure). Landlord and Tenant agree, upon demand of the other, to execute a declaration setting forth the Commencement Date and Termination Date as soon as the Commencement Date and Termination Date have been determined.

Section 3.2.    Termination; Holding Over.

Tenant shall vacate the Premises upon the expiration or earlier termination of this Lease and no notice to quit shall be necessary. Tenant shall reimburse Landlord for and indemnify and hold Landlord harmless against all damages, claims, losses or expenses incurred by Landlord resulting from delay by Tenant in vacating the Premises.

In addition to such reimbursement and indemnification, if Tenant fails to vacate the Premises at the time and in the condition required hereunder, the tenancy under this Lease shall be a tenancy at sufferance, subject to all of the terms of this Lease applicable to a tenancy at sufferance, except that (a) the Annual Basic Rental payable hereunder during said holdover period shall be equal to twice the Annual Basic Rental last payable during the Term and (b) Annual Percentage Rental payable hereunder shall be equal to the highest Annual Percentage Rental payable hereunder for any of the last three (3) Rental Years of the Term, on a prorated basis during such holdover period. For the period of three (3) months prior to the expiration of the Term, Landlord may show the Premises to prospective tenants during normal business hours provided Landlord does not interfere with Tenant's use of the Premises.

ARTICLE IV
USE

Section 4.1.    Prompt Occupancy and Use; Store Hours.

Tenant shall occupy the Premises upon the Commencement Date and thereafter will continuously use the Premises for the Permitted Use and for no other use whatsoever, provided that Tenant may use minor portions of the Premises for storage and office purposes as are reasonably required for the operation of its

- 5 -

(May 22, 2003)

business in the Premises. Without limiting the general prohibition contained in the preceding sentence (except as expressly permitted in Tenant's Permitted Use), Tenant will not, within the Premises, (a) install an automated teller machine; (b) make any vending machine available for use by Tenant's invitees; (c) make available for use by its invitees any facility or device for the transmission or receipt of information, data, sound, images, services or goods, including, but not limited to telephones and computers, (d) place, permit or operate any gaming device in the Premises or use the Premises or any part thereof for gaming or bookmaking purposes, or (e) provide any service which is provided to patrons of the Project from time to time by Landlord, directly or through third parties, as tenants of the Project or otherwise.

Tenant shall cause its business to be conducted in good faith so as to transact the maximum volume of business in and at the Premises and shall keep the Premises open for business at least during the Store Hours or such other reasonable hours as shall be established by Landlord, and notice to Tenant within thirty (30) days prior to the proposed effective date of the new hours. If Tenant shall fail to keep its business open during the required hours and such failure is not due to a Force Majeure, then, in addition to any other remedy available to Landlord under this Lease, Tenant shall pay to Landlord, as Additional Rental for such breach, a sum equal to One Hundred Dollars ($100.00) for each hour or portion thereof during which Tenant shall fail to so operate.

Tenant may operate its business during additional hours with Landlord's prior approval provided Tenant shall pay for its proportionate share of any and all additional costs incurred by Landlord as a result thereof.

Section 4.2.    Tenant Trade Name.

Tenant shall conduct business in the Premises only in the Tenant Trade Name; provided, however, upon prior notice to Landlord, Tenant may change its trade name if substantially all of Tenant's and Tenant's affiliates' stores operating under the same Tenant Trade Name also change their trade name to such new trade name, and such other trade name will not conflict with, and in Landlord's reasonable judgment is not likely to confuse the public regarding, the trade names of other tenants in the Project. Within thirty (30) days of a permitted change in Tenant Trade Name, Tenant agrees, at its sole cost and expense, to replace its storefront sign to reflect the new Tenant Trade Name. Plans and specifications for such storefront sign must be set forth in detail and submitted to Landlord for approval prior to installation of said sign.

ARTICLE V
RENTAL

Section 5.1.    Rental.

Tenant agrees to pay to Landlord as rental ("Rental") for the Premises (a) the Annual Basic Rental specified in clause G of Section 1.1; plus (b) the Annual Percentage Rental specified in clause H of Section 1.1; plus (c) Tenant's Occupancy Charge specified in clause I of Section 1.1; plus (d) all additional sums, charges or amounts due under this Lease, whether or not such sums, charges or amounts are referred to as additional rental (collectively referred to as "Additional Rental").

Annual Basic Rental shall be paid by Tenant in equal monthly installments in advance on the first day of each full calendar month during the Term, the first such payment to include any prorated Annual Basic Rental for the period from the Commencement Date to the first day of the first full calendar month in the Term.

Annual Percentage Rental shall be paid by Tenant monthly during each Rental Year on or before the fifteenth (15th) day following the close of each calendar month commencing with the first month during each Rental Year that Tenant's aggregate Gross Sales for such Rental Year exceed the Breakpoint for such Rental

(May 22, 2003)

Year.  Monthly payments of Annual Percentage Rental shall be calculated by multiplying the amount of Gross Sales for the month in question by the percentage specified in Section 1.1.H., with appropriate adjustment for the month in which the Breakpoint is achieved.  As soon as practicable after the end of each Rental Year, the Annual Percentage Rental shall be finally determined and any necessary payment or refund shall be promptly made.

Tenant's Occupancy Charge shall be paid by Tenant in equal monthly installments in advance on the first day of each calendar month during the Term, the first such payment to include any prorated Tenant's Occupancy Charge for the period from the Commencement Date to the first day of the first full calendar month in the Term.  Tenant's Occupancy Charge shall be increased as of January 1st of each year during the Term by an amount equal to the greater of three percent (3%) or the percentage increase in the CPI multiplied by Tenant's Occupancy Charge for the prior calendar year.  "CPI" shall mean the Consumer Price Index for All Urban Consumers (U. S. City Average) published by the Bureau of Labor Statistics of the United States Department of Labor.  The percentage increase in the CPI shall be determined by (a) taking the September CPI most recently reported prior to the calendar year for which the increase is effective and subtracting the September CPI reported one year earlier (the "Prior Period CPI") and (b) dividing the result by the Prior Period CPI.

If during the Term the CPI is changed or discontinued, Landlord shall choose a comparable index, formula or other means of measurement of the relative purchasing power of the dollar and such substitute index, formula or other means of measurement shall be utilized in place of the CPI as if it had been originally designated in this Lease.

Unless the time for payment is otherwise expressly stated in this Lease, Additional Rental shall be paid by Tenant on or before the tenth (10th) day following Landlord's billing Tenant therefor.

The first "Rental Year" shall commence on the Commencement Date and shall end at the close of the twelfth full calendar month following the Commencement Date; thereafter each Rental Year shall consist of successive periods of twelve calendar months.  Any portion of the Term remaining at the end of the last full Rental Year shall constitute the final Rental Year and all Rental shall be apportioned therefor.

Annual Basic Rental, the Breakpoint and Tenant's Occupancy Charge shall be adjusted proportionately for any Rental Year of more or less than twelve (12) calendar months.

Tenant may recover as a credit against Annual Basic Rental, payable during the first four (4) calendar months of the Term, an amount ("Recapture Allowance") equal to Seven Thousand Six Hundred Ninety-three Dollars and No Cents ($7,696.00) of Tenant's documented cost of Tenant's original construction and fixturing of the Premises based on paid invoices submitted to Landlord, together with a copy of the receipted bills for such work, "releases" or waivers of liens from all parties performing work in the Premises and a duly notarized affidavit from Tenant stating that all bills have been paid and that there are no outstanding obligations owed with respect to the work done in the Premises.  When Tenant has recovered the total amount as set forth above, Tenant shall take no further credits against Annual Basic Rental payable.  This provision shall not be construed to otherwise waive Landlord's rights this Lease.

Notwithstanding the foregoing, if this Lease shall terminate, or if this Lease is assigned, conveyed or is in any way transferred for any reason to another entity or to the surviving entity in connection with a merger, consolidation or acquisition of Tenant (other than Tenant's parent, subsidiary or affiliate) prior to Tenant's taking any or all of the Recapture Allowance, then, and in such event, the Recapture Allowance shall be automatically canceled and withdrawn by Landlord with respect to any future credit of Recapture Allowance.

In the event Tenant has taken the Recapture Allowance and this Lease subsequently terminates or this Lease is assigned, conveyed or transferred to another entity or to the surviving entity in connection with a merger,

- 7 -

(May 22, 2003)

consolidation or acquisition of Tenant (other than Tenant's parent, subsidiary or affiliate), the amount of the Recapture Allowance taken stated below shall be repaid by Tenant to Landlord. If such event occurs (a) within two (2) years from the Commencement Date, Tenant shall be required to repay to Landlord, upon demand, the amount of the Recapture Allowance taken thusfar by Tenant as and for its Recapture Allowance; or (b) if such event occurs after two (2) years from the Commencement Date, Tenant shall be required to repay Landlord, upon demand, a portion of the amount of the Recapture Allowance taken up to the effective date of such termination, merger, consolidation or acquisition, which portion shall be determined by multiplying the total amount of the Recapture Allowance taken thusfar by Tenant by a fraction, the numerator of which shall be the amount of the unexpired Term remaining in the Lease, and the denominator of which shall be the full Term of the Lease. Nothing herein contained shall be construed to waive Landlord's rights with regard to Sections 16.1. and 16.2. of this Lease.

Section 5.2. "Gross Sales" Defined.

"Gross Sales" means the actual sales prices or rentals of all goods and merchandise sold, leased, licensed or delivered, and the actual charges for all services performed by Tenant, or by any subtenant, licensee or concessionaire in, at, from, or arising out of the use of the Premises, whether for wholesale, retail, cash, credit, trade-in or otherwise, without reserve or deduction for inability or failure to collect except as set forth below. Gross Sales shall include, without limitation, sales and services (a) actual sales prices or rentals of all goods and merchandise sold, leased, licensed or delivered, and the actual charges for all services performed by Tenant, or by any subtenant, licensee or concessionaire in, at, from, or arising out of the use of the Premises whether delivery or performance is made from the Premises or from some other place, (b) made or performed by mail, telephone, telefax, e-mail, Internet or any other communications medium to, at or from the Premises, (c) made or performed by means of mechanical or other vending devices in the Premises, or (d) which Tenant or any subtenant, licensee, concessionaire or other person in the normal and customary course of its business would credit or attribute to its operations in any part of the Premises. No franchise, occupancy or capital stock tax and no income or similar tax based on income or profits shall be deducted from Gross Sales.

The following shall not be included in Gross Sales: (i) any exchange of merchandise between stores of Tenant where such exchange is made solely for the convenient operation of Tenant's business, (ii) sales of trade fixtures, machinery and equipment not part of Tenant's inventory, (iii) sales, use, luxury or excise taxes separately stated from the sales price, (iv) charges for any service such as alterations and/or repairs made at no profit to Tenant, (v) sales to employees at discount to the extent that such sales do not exceed one percent (1%) of the Gross Sales during any Rental Year and are at no profit to Tenant, (vi) insurance proceeds, (vii) sales in bulk to manufacturers and jobbers, (viii) service charges payable to Tenant on accounts receivable, and (ix) charges made for delivery at no profit to Tenant which shall be shown as a separate charge. The following may be deducted from Gross Sales: (a) cash or credit refunds to customers on transactions previously reported in Gross Sales and (b) to the extent that any purchase was previously included in Gross Sales, bad debts not in excess of one percent (1%) of Gross Sales in any one Rental Year (provided, however, that if Tenant subsequently receives payment on any account theretofore excluded, such payment shall be included in Gross Sales for the Rental Year in which received). Tenant shall not deduct from Gross Sales cash or credit refunds to customers on transactions which were catalog, electronic or Internet sales not included in Gross Sales. Those items which Tenant is permitted to exclude or deduct from Gross Sales may only be so excluded or deducted if complete, accurate and separate records relating thereto are maintained and preserved by Tenant and made available to Landlord.

Deposits or payments on layaway merchandise sales (provided the customer has not taken delivery of the merchandise) shall be included in Gross Sales at the time such sale is final and shall be included as part of the overall sale. A "final" sale shall occur at the time a customer takes delivery of the merchandise. In the event that an order is canceled for which Tenant has received a deposit or partial payment which is not refunded, such deposit or partial payment shall be included in Gross Sales. Sales of gift certificates shall not

- 8 -

(May 22, 2003)

be included in Gross Sales but the redemption of gift certificates at the Premises shall be included in Gross Sales, whether or not purchased at the Premises.

Section 5.3.    Statements of Gross Sales.

Tenant shall deliver to Landlord:  (a) within fifteen (15) days after the close of each calendar month of the Term, a written report signed by Tenant or by an authorized officer or agent of Tenant, showing the Gross Sales made in the preceding calendar month and (b) within sixty (60) days after the close of each Rental Year, a statement of Gross Sales (prior to excluding and deducting those items enumerated in the second paragraph of Section 5.2) and an itemization of any exclusions and deductions made by Tenant as permitted by Section 5.2 for the preceding Rental Year which shall conform to and be in accordance with generally accepted accounting principles and Section 5.2.  The annual statement shall be accompanied by the signed certificate of an independent Certified Public Accountant or the chief financial officer of Tenant stating specifically that he has examined the report of Gross Sales for the preceding Rental Year, and the calculation of Gross Sales has been made in accordance with the definition of Gross Sales contained in this Lease.  If Tenant shall fail to deliver such annual statement and certificate to Landlord within said sixty (60) day period, Landlord shall have the right, after ten (10) days notice to Tenant, to employ its authorized representative to examine such books and records, including without limitation all records required by Section 5.4, as may be necessary to certify the amount of Tenant's Gross Sales for such Rental Year, and Tenant shall pay to Landlord the reasonable cost thereof as Additional Rental.

If such audit shall disclose that Tenant's records, in the opinion of such independent Certified Public Accountant, are inadequate to disclose such Gross Sales, Landlord shall be entitled to collect, as Additional Rental, an equitable sum determined by such independent Certified Public Accountant but not exceeding fifty percent (50%) of the Annual Basic Rental payable by Tenant during the period in question.

Section 5.4.    Tenant's Records.

In order for Landlord to verify Gross Sales, Tenant will use and retain magnetic computer tapes (including tapes for its point of sale registers in the Premises), or such other device for recording sales as Landlord approves, which will disclose each sale or transaction.  Tenant will preserve for at least three (3) years, and during the Term shall keep at the Tenant Notice Address or the Premises, original or duplicate books and records, which shall disclose all information required to determine Tenant's Gross Sales and which shall conform to and be in accordance with generally accepted accounting principles.  Not more than once in any Rental Year upon ten (10) days' prior written notice, Landlord or any Mortgagee, their agents and accountants, shall have the right during business hours to make any examination or audit of such books and records which Landlord or such Mortgagee may desire.  If such audit shall disclose a liability in any Rental Year for Rental in excess of the Rental theretofore paid by Tenant for such period, Tenant shall promptly pay such liability.  If Tenant fails to provide adequate records or such audit shall disclose that Tenant has underreported Gross Sales by five percent (5%) or more during any Rental Year, (a) Tenant shall promptly respond to the audit or order another independent audit at Tenant's own expense, or (b) pay the reasonable cost of audit and interest at the Default Rate on all additional Annual Percentage Rental then payable, accruing from the date such additional Annual Percentage Rental was due and payable, and (c) an Event of Default shall be deemed to exist unless, within ten (10) business days Tenant orders another independent audit, and within ten (10) business days, Tenant furnishes Landlord with adequate records or evidence satisfactorily demonstrating to Landlord that such inadequate records or underreporting of Gross Sales was the result of good faith error on Tenant's part. If such audit shall disclose an overpayment of Rental by Tenant, Landlord shall promptly credit Tenant the amount of any overpayment.

Section 5.5.    Payment of Rental; Qualified Rental.

- 9 -

(May 22, 2003)

Tenant shall pay all Rental when due, without any setoff, deduction or prior demand therefor. Except as provided herein, Tenant shall not pay any Rental earlier than one (1) month in advance of the date on which it is due. If Tenant shall fail to pay any Rental within ten (10) days after the same is due, Tenant shall pay Additional Rental equal to the greater of One Hundred Dollars ($100.00) or ten percent (10%) of any Rental payment not paid when due to reimburse Landlord for its additional administrative costs. In addition, any Rental which is not paid within ten (10) days after the same is due shall bear interest at the Default Rate from the first day due until paid. Rental shall be paid and statements of Gross Sales delivered or mailed at such place as Landlord may from time to time designate. Any payment by Tenant or acceptance by Landlord of a lesser amount than shall be due from Tenant to Landlord shall be treated as a payment on account. The acceptance by Landlord of a check for a lesser amount with an endorsement or statement that such lesser amount is payment in full shall be given no effect, and Landlord may accept such check without prejudice to any other rights or remedies which Landlord may have against Tenant.

Landlord and Tenant intend that all Rental paid to Landlord under this Lease will qualify as rents from real property within the meaning of Section 856(d) of the Internal Revenue Code of 1986, as amended and as further defined in Treasury Regulation Section 1.856-4 ("Qualified Rental"). If Landlord advises Tenant that, in Landlord's sole discretion, there is any risk that all or part of any payments made by Tenant under this Lease will not qualify as Qualified Rental, Tenant agrees to cooperate with Landlord to restructure this Lease in such manner as may be necessary to enable such payments to be treated as Qualified Rental, provided such restructuring will not have a material adverse economic impact on Tenant, and providing that Tenant shall have no liability of any expenses incurred pursuant thereto.

Any payment by Tenant shall be without prejudice and shall not be deemed a waiver of any rights or remedies (including, but not limited to, setoffs or deductions from Rental) which Tenant may have under this Lease against Landlord.

Section 5.6.    Future Expansion/Renovation.

In the event that during the Term (a) one or more additional Anchors are constructed in the Project, or (b) one or more expansions of the Project, involving the addition of at least 50,000 square feet of floor area occurs, or (c) the Common Areas are expanded or renovated by the construction of capital improvements which have an aggregate cost equal to or greater than an amount equal to $20.00 multiplied by Landlord's Floor Area (any of the foregoing being an "Expansion"), then, upon the opening for business of each Expansion, the Annual Basic Rental shall be increased by ten percent (10%) for each such Expansion and the Breakpoint shall be increased by a like percentage.

ARTICLE VI
TAXES

Section 6.1.    Tenant to Pay Proportionate Share of Taxes

Tenant shall pay in each Tax Year during the Term, as Additional Rental, a proportionate share of all amounts payable by Landlord with respect to real estate taxes, ad valorem taxes and assessments, general and special, taxes on real estate rental receipts, taxes on Landlord's gross receipts, or any other tax imposed upon or levied against real estate, or upon owners of real estate as such rather than persons generally, extraordinary as well as ordinary, foreseeable and unforeseeable, including taxes imposed on leasehold improvements which are assessed against Landlord, payable with respect to or allocable to Landlord's Property, including all land, Landlord's Building and all other buildings and improvements situated thereon, together with the reasonable cost (including fees of attorneys, consultants and appraisers) of any negotiation, contest or appeal pursued by Landlord in an effort to reduce any such tax, assessment or charge, and all of Landlord's reasonable

(May 22, 2003)

administrative costs in relation to the foregoing, all of the above being collectively referred to herein as "Taxes." Tenant's proportionate share of Taxes shall be computed by multiplying the amount of such Taxes (less any contributions by Anchors and Major Tenants) by a fraction, the numerator of which shall be Tenant's Floor Area and the denominator of which shall be Landlord's Floor Area less the floor area of any Major Tenants. Landlord, at its option, from time to time, may exclude from Landlord's Floor Area any Landlord's Floor Area not existing as of the date of execution of this Lease, provided the Taxes associated therewith are excluded from Taxes. For the Tax Year in which the Term commences or terminates, the provisions of this Section shall apply, but Tenant's liability for its proportionate share of any Taxes for such year shall be subject to a pro rata adjustment based upon the number of days of such Tax Year falling within the Term. As used herein, "Tax Year" means each yearly period established by the appropriate taxing authorities as the tax year.

If an assessment is payable in installments, Tenant's proportionate share of such assessment shall be computed as though Landlord had elected to pay the same in the maximum number of installments permitted by law without additional costs, penalties or interest being assessed by reason of such installments, provided the Term has not expired or this Lease has not terminated. Tenant shall not have any liability with respect to installments which are attributable to the period after the expiration of the Term.

So long as Tenant is not in default of the requirement to pay its Taxes, Tenant shall not be required to pay any interest or penalties imposed for non-payment of Taxes.

Taxes shall not include any general income, franchise, corporate transfer, estate or gift tax imposed upon Landlord generally rather than as owner and/or lessee of Landlord's Property.

Section 6.2.    Payment of Proportionate Share of Taxes.

Tenant's proportionate share of Taxes shall be paid by Tenant in monthly installments in such amounts as are reasonably estimated and billed for each Tax Year during the Term by Landlord, each such installment being due on the first day of each calendar month. At any time during a Tax Year, Landlord may reestimate Tenant's proportionate share of Taxes and thereafter adjust Tenant's monthly installments payable during the Tax Year to reflect more accurately Tenant's proportionate share of Taxes. Within one hundred twenty (120) days after Landlord's receipt of tax bills for each Tax Year, or such reasonable (in Landlord's determination) time thereafter, Landlord will notify Tenant of the amount of Taxes for the Tax Year in question and the amount of Tenant's proportionate share thereof. Any overpayment or deficiency in Tenant's payment of its proportionate share of Taxes for each Tax Year shall be paid promptly. Failure of Landlord to provide such notice within the time prescribed shall not relieve Tenant of its obligations hereunder. Notwithstanding the foregoing, if Landlord is required under law to pay Taxes in advance, Tenant agrees to pay Landlord, upon Commencement Date, an amount equal to Tenant's share of Taxes for the entire Tax Year in which the Term of this Lease commences, and in such event, at the termination of this Lease, Tenant shall be entitled to a refund of Taxes paid which are attributable to a period after this Lease expires.

Section 6.3.    Taxes on Rental; Tenant's Taxes.

Tenant shall also pay any sales, excise and other taxes (not including, however, Landlord's income taxes) levied by any taxing authority upon any Rental payable hereunder. Tenant shall also pay, prior to the time the same shall become delinquent or payable with penalty, all taxes imposed on its inventory, furniture, trade fixtures, apparatus, equipment, leasehold improvements installed by Tenant or by Landlord on behalf of Tenant (except to the extent such leasehold improvements shall be covered by Taxes referred to in Section 6.1), and any other property of Tenant. Landlord may require that Tenant's leasehold improvements be separately assessed by the taxing authority.

ARTICLE VII

-11-

(May 22, 2003)

IMPROVEMENTS

Section 7.1.    Tenant's Improvements.

Tenant agrees, at its sole cost and expense, to remodel the interior and exterior of the Premises using new and quality materials and equipment. Tenant shall submit to Landlord for approval (not to be unreasonably withheld or delayed) plans and specifications for such remodeling immediately upon execution of this Lease. Tenant shall commence its remodeling promptly following Landlord's approval of Tenant's plans and specifications and will diligently pursue its remodeling so that it will be completed prior to the Commencement Date in accordance with such approved plans and specifications. Tenant may enter the Premises at least ninety (90) days prior to the Outside Commencement Date to commence its remodeling. During said remodeling period, Tenant shall perform all duties and obligations imposed by this Lease, except for the obligation to pay Rental (other than Rental payable pursuant to Section 12.1). Any modifications or additions to the existing sprinkler system, whether required as a result of the improvements to be made to the Premises pursuant to this Section 7.1 or requested by Tenant after the Commencement Date, shall be made by Landlord at Tenant's cost and expense (after agreement between Landlord and Tenant on a price for such work) or, at Landlord's election, shall be made by Tenant (at its cost and expense), provided Tenant utilizes a licensed contractor approved by Landlord for such purpose.

Provided Tenant's construction costs for it's initial improvements to the Premises equal or exceed Two Hundred Fifty Thousand dollars ($250,000), Landlord agrees to pay Tenant a construction allowance in the amount of Forty Dollars and No Cents ($40.00), multiplied by Tenant's Floor Area, of Tenant's documented cost of its initial improvements to the Premises ("Construction Allowance"). Provided Tenant has complied with all terms and conditions of this Lease, said amount will be paid to Tenant within sixty (60) days after the last to occur of (a) the execution of this Lease by Landlord and Tenant, (b) the date Tenant completes the work required of it under, and in compliance with, this Section 7.1.; (c) the date Tenant opens for business at the Premises; and (d) the date Tenant furnishes Landlord with a copy of the receipted bills for such work, "releases" or waivers of liens from all parties performing work in the Premises and an affidavit from Tenant stating that all bills have been paid and that there are no outstanding obligations owed with respect to the work done in the Premises.

In the event that this Lease shall terminate, or if this Lease is assigned, conveyed or is in any way transferred for any reason to another entity or to the surviving entity in connection with a merger, consolidation or acquisition of Tenant (other than Tenant's parent, subsidiary or affiliate) prior to Landlord's payment to Tenant of such Construction Allowance, then, and in such event, the Construction Allowance shall be automatically canceled and withdrawn by Landlord with respect to any future payments or credit of the Construction Allowance.

In the event Landlord has made payment of the Construction Allowance to Tenant and this Lease subsequently terminates prior to the end of the Term or this Lease is assigned, conveyed or transferred to another entity or to the surviving entity in connection with a merger, consolidation or acquisition of Tenant (other than Tenant's parent, subsidiary or affiliate), said Construction Allowance shall be repaid by Tenant to Landlord in accordance with the immediately succeeding sentence. If such event occurs (a) within two (2) years from the Commencement Date, Tenant shall be required to repay to Landlord, upon demand, the full amount of the Construction Allowance received (whether by cash or credit) by Tenant; or (b) after two (2) years from the Commencement Date, Tenant shall be required to repay Landlord, upon demand, a portion of the Construction Allowance received (whether by cash or credit) determined by multiplying the total amount of the Construction Allowance received (whether by cash or credit) by a fraction, the numerator of which shall be the amount of the unexpired Term remaining in this Lease, and the denominator of which shall be the full Term of this Lease.

(May 22, 2003)

Nothing in this Section 7.1 shall be construed to waive Landlord's rights with regard to Sections 16.1 and 16.2 of this Lease.

Section 7.2.    Effect of Opening for Business.

By opening the Premises for business, Tenant shall be deemed to have (a) accepted the Premises, (b) acknowledged that the same are in the condition called for hereunder, and (c) agreed that the obligations of Landlord imposed hereunder have been fully performed, except Landlord shall repair (i) any apparent defect in work performed by Landlord of which Tenant notifies Landlord within thirty (30) days after Tenant takes possession of the Premises, and (ii) any latent defect in work performed by Landlord of which Tenant notifies Landlord within six (6) months after Tenant takes possession of the Premises.

Section 7.3.    Mechanic's Liens.

No work performed by Tenant pursuant to this Lease shall be deemed to be for the immediate use and benefit of Landlord so that no mechanic's or other lien shall be allowed against the estate of Landlord by reason of any consent given by Landlord to Tenant to improve the Premises.  Tenant shall pay promptly all persons furnishing labor or materials with respect to any work performed by Tenant or its contractors on or about the Premises.  If any mechanic's or other liens shall at any time be filed against the Premises or any part of the Project by reason of work, labor, services or materials performed or furnished, or alleged to have been performed or furnished, to Tenant or to anyone holding the Premises through or under Tenant, and regardless of whether any such lien is asserted against the interest of Landlord or Tenant, Tenant shall forthwith cause the same to be discharged of record or bonded to the satisfaction of Landlord.  If Tenant shall fail to cause such lien to be so discharged or bonded within thirty (30) days (or such shorter  period required under any Mortgage) after being notified of the filing thereof, then, in addition to any other right or remedy of Landlord, Landlord may bond or discharge the same by paying the amount claimed to be due, and the amount so paid by Landlord, including reasonable attorneys' fees incurred by Landlord either in defending against such lien or in procuring the bonding or discharge of such lien, together with interest thereon at the Default Rate, shall be due and payable by Tenant to Landlord as Additional Rental.

Section 7.4.    Tenant's Leasehold Improvements and Trade Fixtures.

No leasehold improvements (as distinguished from trade fixtures and apparatus) installed in the Premises whether by Tenant, Landlord or others, shall be removed by Tenant from the Premises at any time, without Landlord's prior written consent.  At the termination of this Lease, all leasehold improvements shall be deemed to be part of the Premises, and title thereto shall vest solely in Landlord without payment owing to Tenant.

All trade fixtures and apparatus owned by Tenant shall remain the property of Tenant and may be removed from the Premises unless Tenant shall then be in default of any terms or covenants of this Lease. Tenant shall repair any damage to the Premises caused by the removal of said trade fixtures and apparatus and shall restore the Premises to substantially the same condition as existed prior to the installation of said trade fixtures and apparatus, ordinary wear and tear excepted.

If Tenant is in default, Landlord shall have the benefit of any applicable lien on Tenant's property (specifically excluding Tenant's merchandise) located in or on the Premises as may be permitted under the laws of the state in which the Project is located and in the event such lien is asserted by Landlord in any manner or by operation of law, Tenant shall not remove or permit the removal of said property until the lien has been removed and all defaults have been cured.

- 13 -

(May 22, 2003)

ARTICLE VIII
OPERATIONS

Section 8.1.    <u>Operations by Tenant</u>.

Tenant will at its expense:  (a) keep all exterior store surfaces including the inside and outside of all glass in the doors and windows of the Premises clean; (b) replace promptly any cracked or broken glass of the Premises; (c) maintain the Premises in a clean, orderly and sanitary condition and free of insects, rodents, vermin and other pests; (d) keep any garbage, trash, rubbish or other refuse in rat-proof containers within the interior of the Premises until removed and dispose same in designated receptacles provided by Landlord; (e) keep all mechanical apparatus reasonably free of vibration and noise which may be transmitted beyond the Premises; (f) light the show windows of the Premises and exterior signs and turn the same off to the extent reasonably required by Landlord; (g) comply and cause the Premises to comply with all applicable governmental statutes, laws, rules, orders, regulations and ordinances affecting the Premises or the use thereof; (h) comply with all rules and regulations established by Landlord from time to time which apply generally to all retail tenants in Landlord's Property; and (i) maintain sufficient and seasonal inventory and have sufficient number of personnel to maximize sales volume in the Premises.

Tenant will not: (j) place anything on, or otherwise obstruct, any portion of the Common Areas or entrance to the Premises; (k) use any objectionable advertising medium such as loudspeakers, phonographs, public address systems, sound amplifiers, reception of radio or television broadcasts within the Project, which is in any manner audible or visible outside of the Premises; (l) cause or permit objectionable odors (in Landlord's opinion) to emanate from the Premises; (m) solicit business or distribute handbills or other advertising matter in any Common Areas (including placing any of the same in or upon any automobiles parked in the parking areas); (n) permit the parking of vehicles so as to interfere with the use of any driveway, corridor, footwalk, parking area, mall or other Common Areas; (o) receive or ship articles of any kind outside the designated loading areas for the Premises; (p) use the mall, corridor or any other Common Areas adjacent to the Premises for the sale or display of any merchandise or for any other business, occupation or undertaking; (q) conduct or permit to be conducted any auction, fictitious fire sale, going out of business sale, bankruptcy sale (unless directed by court order), or other similar type sale in or connected with the Premises (but this provision shall not restrict the absolute freedom of Tenant in determining its own selling prices, nor shall it preclude the conduct of periodic seasonal, promotional or clearance sales); (r) use the Premises or otherwise operate in a manner which will be in violation of law or which would violate Landlord's insurance policies or cause an increase in the cost of Landlord's insurance; (s) place a load upon any floor which exceeds the floor load which the floor was designed to carry; (t) operate its heating or air-conditioning in such a manner as to drain heat or air-conditioning from the Common Areas or from the premises of any other tenant of the Project; (u) use the Premises for any unlawful or illegal business, use or purpose, or for any business, use or purpose which is immoral or disreputable (including without limitation "adult entertainment establishments" and "adult bookstores"), or which is hazardous, or in such manner as to constitute a nuisance of any kind (public or private), or for any purpose or in any way in violation of the certificates of occupancy (or other similar approvals of applicable governmental authorities); or (v) park or permit its employees to park in areas other than those designated by Landlord, if any, for employee parking.

Section 8.2.    <u>Exterior of Premises</u>.

Tenant shall not maintain within or on the exterior of the Premises any sign, banner, decoration or any other thing which is visible outside the Premises, nor paint the exterior of the Premises, without the prior written approval of Landlord, which approval shall not be unreasonably withheld or delayed if in accordance with Landlord's then-current design or sign criteria.

Section 8.3.    <u>Trash Removal Service</u>.

- 14 -

(May 22, 2003)

At its option, Landlord may furnish (or authorize others to furnish) a service for the removal of trash from receptacles designated by Landlord for the regular deposit by Tenant of its garbage, trash, rubbish or other refuse, and, if it shall do so, then in each Rental Year, at Landlord's election, Tenant shall either (i) reimburse Landlord monthly, as Additional Rental, for all costs incurred by Landlord in furnishing such service, or (ii) pay directly such person, firm or corporation authorized by Landlord to provide such trash removal services.

Section 8.4.    Hazardous Materials.

(a)    "Hazardous Material(s)" means any substance that, by itself or in combination with other materials, is either (i) potentially injurious to public health, safety, or the environment; or (ii) now or in the future regulated by any federal, state, or local governmental authority as potentially injurious to public health, safety, or the environment.

(b)    With the exception of minor amounts of Hazardous Materials customarily and lawfully used in conjunction with the Permitted Use, Tenant, its employees, contractors, agents, and any party acting on behalf of Tenant, shall not store, use, treat, generate, or dispose of Hazardous Materials at the Project.

(c)    Tenant, its employees, contractors, agents, and any party acting on behalf of Tenant shall comply, and shall keep the Premises in compliance, with all laws and regulations relating to Hazardous Materials ("Environmental Laws"); and in addition Tenant shall:

(i)    Promptly provide Landlord with copies of any document, correspondence, report or communication, written or oral, relating to Hazardous Materials at or affecting the Project (x) to or from any regulatory body, or (y) stating a basis for any potential liability or responsibility of Tenant, Landlord, or the Project; including all such documents, correspondence, reports or communications prepared by or on behalf of Tenant. In addition to the above, at Landlord's request, Tenant shall provide copies of any and all records and communications whatsoever relating to Hazardous Materials at or affecting the Project.

(ii)    Immediately notify Landlord in the event of a suspected or confirmed release of a Hazardous Material or violation of Environmental Laws at or affecting the Project and caused by or related to the operations of Tenant, its employees, contractors, agents, or any party acting on behalf of Tenant and, at Landlord's sole option, either promptly remediate or correct such release or violation to Landlord's satisfaction or reimburse Landlord's cost of remediation (including reasonable attorneys' and consultants' fees); and compensate Landlord and/or third parties for all resultant damage.

(iii)    Permit Landlord reasonable access to the Premises for the purpose of conducting an environmental audit or testing, the cost of which shall be borne by Landlord unless the results indicate activity prohibited by Environmental Laws or hereunder.

(iv)    Upon expiration or other termination of this Lease, remove all Hazardous Materials from the Premises, and at Landlord's option cause to be performed and provided to Landlord an environmental audit of the Premises, using a consultant reasonably acceptable to Landlord, and correct, at its expense, any deficiencies noted by the audit.

-15-

(May 22, 2003)

(d)    Landlord shall comply with all Environmental Laws regarding its storage, use, treatment, generation, and disposal of Hazardous Materials, and, if required by law, shall promptly remediate any release of Hazardous Materials or correct any violation of Environmental Laws at or affecting the Project and resulting from such storage, use, treatment, generation or release.

(e)    This Section 8.4 shall survive the expiration or other termination of this Lease.


ARTICLE IX
REPAIRS AND ALTERATIONS

Section 9.1.    Repairs to be Made by Landlord.

In addition to Landlord's obligations under Section 14.1, Landlord, at its expense, will make, or cause to be made in a reasonably prompt and diligent manner (a) structural repairs to exterior walls, structural columns, roof and structural floors which collectively enclose the Premises (excluding, however, all doors, door frames, storefronts, windows and glass); (b) repairs to plumbing, electrical or other mechanical installations which pass over and/or beneath the Premises and service any other tenant's premises (whether individually or together with other premises, including the Premises) but are not servicing solely the Premises; and (c) such repairs as are specifically set forth as Landlord's responsibility under Section 12.1 hereof. Any repairs made by Landlord shall be performed so as to minimize disruptions to Tenant's use of the Premises; provided, however, Landlord shall be under no obligation to incur additional costs (such as overtime costs) in order to minimize disruptions.

Section 9.2.    Repairs to be Made by Tenant.

All repairs to the Premises or any installations, equipment or facilities therein (or located outside of the Premises but serving only the Premises), other than those repairs required to be made by Landlord pursuant to Section 9.1, shall be made by Tenant, promptly, at its expense. Tenant will keep the interior of the Premises, together with all electrical, plumbing and other mechanical installations therein (or located outside of the Premises but serving only the Premises) and (if and to the extent provided in Schedule D) the heating, ventilating and air-conditioning system in the Premises, in good order and repair and will make promptly all necessary replacements. Tenant will surrender the Premises at the expiration of the Term in as good condition as when received, damage by Casualty, unavoidable accident or Act of God and ordinary wear and tear excepted. Tenant will not overburden or exceed the capacity of any utility serving the Premises or within the Premises, and at its expense, subject to the provisions of Section 9.3, will make any additional installation which may be required in connection with Tenant's apparatus. Any damage or injury sustained by any person because of Tenant's failure to repair the Premises as required herein, shall be paid for by Tenant.

Section 9.3.    Alterations by Tenant.

Tenant will not make any alterations, renovations, improvements or other installations in, on or to any part of the Premises (including, without limitation, any alterations of the storefront, signs, structural alterations, or any cutting or drilling into any part of the Premises or any securing of any fixture, apparatus, or equipment of any kind to any part of the Premises) unless and until Tenant shall have caused plans and specifications therefor to have been prepared, at Tenant's expense, by an architect or other duly qualified person and shall have obtained Landlord's approval (not to be unreasonably withheld or delayed) thereof. If such approval is granted, Tenant shall cause the work described in such plans and specifications to be performed, at its expense, promptly, efficiently, competently and in a good and workmanlike manner by duly qualified and licensed persons or entities, using first grade materials, without disruption to the operations of tenants or other

-16-

(May 22, 2003)

occupants of the Project. All such work shall comply with all applicable codes, rules, regulations and ordinances.

Notwithstanding the foregoing, Tenant shall have the right to make interior repairs or replacements which do not require any structural alteration or impose any greater load on any structural portion of the Premises, and are in accordance with Tenant's originally approved plans and are in conformance with Landlord's most current design criteria.

Section 9.4.    Changes and Additions to Project.

Landlord reserves the right at any time and from time to time  to (a) make or permit changes to the Project including additions to, subtractions from, rearrangements of, alterations of, modifications of, or supplements to, the building areas, walkways, driveways, parking areas, or other Common Areas, and (b) construct improvements in Landlord's Building and the Project and to make alterations thereof or additions thereto and to build additional stories on or in any such building(s) and build adjoining same, including (without limitation) kiosks, pushcarts and other displays in the Common Areas; provided, however, that no such changes, rearrangements or other construction shall reduce the parking areas below the number of parking spaces required by law. Any changes or additions by Landlord to Landlord's Property shall be performed in such a manner so as not to unreasonably interfere with Tenant's use of the Premises and shall not change in a material, adverse way the access to the Premises from the Common Areas immediately in front of and adjacent to the Premises.

Section 9.5.    Roof and Walls.

Landlord shall have the exclusive right to use any part of the roof of the Premises for any purpose; to erect additional stories or other structures over all or any part of the Premises; to erect temporary scaffolds and other aids to construction on the exterior of the Premises, provided that access to the Premises shall not be denied; and to install, maintain, use, repair and replace within the Premises pipes, ducts, conduits, wires and all other mechanical equipment serving other parts of Landlord's Property, the same to be in locations within the Premises as will not unreasonably deny Tenant's use thereof. Landlord may make any use it desires of the side or rear walls of the Premises or other structural elements of the Premises (including, without limitation, free-standing columns and footings for all columns), provided that such use shall not encroach on the interior of the Premises unless (a) all work carried on by Landlord with respect to such encroachment shall be done during hours when the Premises are not open for business and otherwise shall be carried out in such a manner as not to unreasonably interfere with Tenant's operations in the Premises, (b)  Landlord, at its expense, shall provide any security services to the Premises required by such work, and (c) Landlord, at its expense, shall repair all damage to the Premises resulting from such work. Landlord agrees that any such uses contemplated hereunder shall not decrease the size of the Premises (except in a de minimis manner) nor materially interfere with Tenant's use of or access to the Premises from the Common Areas immediately in front of and adjacent to the Premises, and any such pipes or conduits shall be concealed along the walls and ceilings of the Premises.

ARTICLE X
COMMON AREAS

Section 10.1.    Use of Common Areas.

Landlord grants to Tenant and its agents, employees and customers a non-exclusive license to use the Common Areas in common with others during the Term, subject to the exclusive control and management thereof at all times by Landlord or others and subject, further, to the rights of Landlord set forth in Sections 9.4 and 10.2.

-17-

(May 22, 2003)

Section 10.2.    Management and Operation of Common Areas.

Landlord will operate and maintain the Common Areas in a commercially reasonable and appropriate manner consistent with the operation of a first class project. Landlord will have the right (a) to establish, modify and enforce reasonable and non-discriminatory rules and regulations with respect to the Common Areas; (b) to enter into, modify and terminate easement and other agreements pertaining to the use and maintenance of the Common Areas; (c) to close all or any portion of the Common Areas to such extent as may, in the opinion of Landlord, be necessary to prevent a dedication thereof or the accrual of any rights to any person or to the public therein; (d) to close temporarily any portions of the Common Areas; (e) to discourage non-customer parking; and (f) to do and perform such other acts in and to said areas and improvements as, in the exercise of good business judgment, Landlord shall determine to be advisable.

ARTICLE XI
PROMOTION OF THE PROJECT

Landlord may formulate and carry out an ongoing program for the promotion of the Project, which program may include, without limitation, special events, shows, displays, signs, marquees, decor, seasonal events, institutional advertising for the Project, promotional literature to be distributed within Landlord's Property and other activities within the Project designed to attract customers. In marketing the Project, Landlord shall have the right to name Tenant's store in the Project.

Prior to the date on which Tenant commences construction in the Premises, Tenant shall pay Landlord the Initial Marketing Contribution set forth in Section 1.1.E.

ARTICLE XII
UTILITIES

Section 12.1.    Utility Services.

Landlord shall provide the facilities for supplying heating, ventilating and air-conditioning, water, sanitary sewer, telephone and electricity to the Premises as follows:

(a) Electricity.  Set forth in Schedule C, attached hereto, are the terms and conditions under which Landlord shall supply or Tenant shall obtain electricity for use in the Premises;

(b) HVAC.  Set forth in Schedule D attached hereto, are the terms and conditions under which heating, ventilating and air-conditioning will be provided to the Premises;

(c) Fire Protection Sprinkler System.  Landlord shall provide ordinary repair and maintenance for the fire protection sprinkler system in the Premises, which system shall remain the property of Landlord; and

(d) Water and Sewer.  Tenant shall pay all charges for water and sewer used by it and supplied by a public utility or public authority, or any other person, firm or corporation.

Unless otherwise provided in this Lease, including the schedules attached hereto, Landlord shall not be responsible for providing any utility service to the Premises, nor for providing meters or other devices for the measurement of utilities supplied to the Premises, and Tenant shall arrange for the furnishing to the Premises of such utility services as it may require. Tenant shall be solely responsible for and shall promptly pay, as and when the same become due and payable, all charges for  electricity, gas, telephone and any other

-18-

(May 22, 2003)

utility used or consumed in the Premises and supplied by a public utility or public authority or any other person, firm or corporation, including Landlord, supplying the same.

      Section 12.2.   <u>Discontinuances and Interruptions of Utility Services</u>.

      Landlord shall not be liable to Tenant in damages or otherwise (a) if any utility shall become unavailable from any public utility company or any other person or entity (including Landlord) supplying or distributing such utility, or (b) for any interruption in any utility service caused by the making of any necessary repairs or improvements or by any cause beyond Landlord's reasonable control, and the same shall not constitute a termination of this Lease or an eviction of Tenant.  Notwithstanding the foregoing, if any utility to the Premises should become unavailable for a period in excess of forty-eight (48) consecutive hours, and if, as a result of such unavailability, Tenant is unable to operate its business in the Premises, and if such unavailability is directly caused by the willful act or gross negligence of Landlord, as Tenant's sole and exclusive remedy all Rental shall abate until utility service to the Premises is restored.

ARTICLE XIII
<u>INDEMNITY AND INSURANCE</u>

      Section 13.1.   <u>Indemnities</u>.

      To the extent permitted by law, Tenant shall and does hereby indemnify Landlord, any general or limited partner of Landlord or any general or limited partner of any partner of Landlord, or any shareholder of any corporate partner of any partner of Landlord, or any other holder of any equity interest in Landlord, or in any entity comprising Landlord or its partners and agrees to save each of them harmless and, at Landlord's option, defend each of them from and against any and all claims, actions, damages, liabilities and expenses (including reasonable attorneys' and other professional fees) judgments, settlement payments, and fines paid, incurred or suffered by any of them in connection with loss of life, personal injury and/or damage to property or the environment suffered by third parties (a) arising from or out of the occupancy or use by Tenant of the Premises or any part thereof or any other part of the Project, to the extent occasioned by any act or omission of Tenant, its officers, agents, contractors, employees or (while in the Premises) invitees, or (b) arising, directly or indirectly, wholly or in part, from any conduct, activity, act, omission, or operation involving the use, handling, generation, treatment, storage, disposal or other management of any Hazardous Material(s) in, from or to the Premises, whether or not Tenant may have acted negligently with respect to such Hazardous Materials.

      To the extent permitted by law, Landlord shall and does hereby indemnify Tenant and agrees to save it harmless from and against any and all claims, actions, damages, liabilities and expenses (including reasonable attorneys' and other professional fees), judgments, settlement payments, and fines paid, incurred or suffered by Tenant in connection with loss of life, personal injury and/or damage to property suffered by third parties arising from or out of the use of any portion of the Common Areas by Landlord, to the extent occasioned by any act or omission of Landlord, its officers, agents, contractors or employees.  Landlord shall indemnify, hold harmless and defend Tenant, its agents, servants and employees from and against all claims, actions, losses and expenses made by third parties (including reasonable attorneys' and other professional fees) arising from any conduct, activity, act, omission or operation involving the use, handling, generation, treatment, storage, disposal or release of any Hazardous Material(s) in, from or to the Premises or the Project, to the extent caused directly by the actions of Landlord, its officers, agents, contractors and employees, and not arising solely out of Landlord's position as an owner/operator of the Project.

      The obligations of the parties pursuant to this Section 13.1 shall survive any termination of this Lease with respect to any act, omission or occurrence which took place prior to such termination.

-19-

(May 22, 2003)

Section 13.2.    <u>Landlord Not Responsible for Acts of Others</u>.

Landlord shall not be liable to Tenant, or to those claiming, through Tenant, for any loss or damage which may result from (a) the acts or omissions of persons occupying space in any part of the Project, or their agents, employees, contractors or invitees or (b) from the breaking, bursting, stoppage or leaking of electrical cable and wires, or water, gas, sewer or steam pipes. Tenant acknowledges that its use of the Premises and Project is at its own risk.

Section 13.3.    <u>Tenant's Insurance</u>.

At all times on and after delivery of the Premises to Tenant, Tenant will carry and maintain, at its expense:

(a)    a non-deductible commercial general liability insurance policy, including (but not limited to) insurance against assumed or contractual liability under this Lease, with respect to liability arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto, to afford protection with respect to personal injury, death or property damage of not less than Two Million Dollars ($2,000,000) per occurrence combined single limit/Three Million Dollars ($3,000,000) general aggregate (but not less than $2,000,000 per location aggregate); and

(b)    special form property and casualty insurance policy, including theft coverage, written at not less than eighty percent (80%) replacement cost value covering all of Tenant's personal property in the Premises (including, without limitation, inventory, trade fixtures, furniture and other property removable by Tenant under the provisions of this Lease) and all leasehold improvements installed in the Premises by or on behalf of Tenant, which policy may have a deductible of not more than $25,000; and

(c)    comprehensive boiler and machinery equipment policy, including electrical apparatus, if applicable, which policy may have a deductible of not more than $25,000; and

(d)    if and to the extent required by law, worker's compensation insurance policy, or similar insurance in form and amounts required by law.

Tenant may maintain the required liability and special form property and casualty insurance in the form of a blanket policy covering other locations of Tenant in addition to the Premises; provided, however, that Tenant shall provide Landlord with a certificate of insurance specifically naming the location of the Premises.

Section 13.4.    <u>Tenant's Contractor's Insurance</u>.

Tenant shall require any contractor of Tenant performing work on the Premises to carry and maintain, at no expense to Landlord, a non-deductible:

(a)    commercial general liability insurance policy, including (but not limited to) contractor's liability coverage, contractual liability coverage, completed operations coverage, broad form property damage endorsement and contractor's protective liability coverage, to afford protection, with respect to personal injury, death or property damage of not less than Three Million Dollars ($3,000,000) per occurrence combined single limit/Five Million Dollars ($5,000,000) general aggregate (but not less than $3,000,000 per location aggregate);

-20-

(May 22, 2003)

(b)     comprehensive automobile liability insurance policy with a combined single limit for each occurrence of not less than One Million Dollars ($1,000,000) with respect to personal injury or death and property damage; and

(c)     worker's compensation insurance policy or similar insurance in form and amounts required by law.

Section 13.5.     Policy Requirements.

The companies writing any insurance which Tenant is required to carry and maintain pursuant to Sections 13.3 and 13.4, shall maintain a rating from A.M. Best Company, Inc. of at least A-IX, or a comparable rating if the current rating system is changed. The commercial general liability policies shall name Landlord and/or its designee(s) as additional insured and casualty insurance policies shall name Landlord and/or its designee(s) as loss payee. All policies shall be primary and non-contributory with respect to Landlord's liability arising out of the act or omission of Tenant, its officers, agents, contractors, employees or (while in the Premises) invitees, and shall also contain a provision by which the insurer agrees that such policy shall not be cancelled, materially changed or not renewed without at least thirty (30) days' advance notice to Landlord, c/o The Rouse Company, 10275 Little Patuxent Parkway, Columbia, Maryland 21044, Attention: Risk Manager, by certified mail, return receipt requested, or to such other party or address as may be designated by Landlord or its designee. Each such policy, or a certificate thereof, shall be deposited with Landlord by Tenant promptly upon commencement of Tenant's obligation to procure the same.

Section 13.6.     Waiver of Right of Recovery.

Except for the indemnification contained in Section 13.1 with respect to Hazardous Materials, neither Landlord nor Tenant shall be liable to the other or to any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage to any building, structure or other tangible property, or any resulting loss of income, or losses under worker's compensation laws and benefits, even though such loss or damage might have been occasioned by the negligence of such party, its agents or employees. The provisions of this Section 13.6 shall not limit the indemnification for liability to third parties pursuant to Section 13.1. In the event of a permitted sublease or other occupancy agreement for all or a portion of the Premises, the subtenant or occupant shall expressly agree in writing to be bound by the provisions of this Section 13.6 (as if such subtenant or occupant were Tenant hereunder) for the benefit of Landlord. The owner or occupant of any Anchor within the Project shall have the benefit of this Section 13.6. and none of them shall be liable to Tenant or Tenant's insurance company for any loss or damage.


ARTICLE XIV
DAMAGE AND DESTRUCTION

Section 14.1.     Landlord's Obligation to Repair and Reconstruct.

If the Premises shall be damaged by fire, the elements, accident or other casualty (any of such causes being referred to herein as a "Casualty"), then, subject to the provisions of Section 14.2, Landlord shall in a reasonably prompt manner cause such damage to be repaired. All such repairs shall be made at the expense of Landlord; provided, however, that Landlord shall not be liable for interruption to Tenant's business or for damage to or replacement or repair of Tenant's personal property (including, without limitation, inventory, trade fixtures, furniture and other property removable by Tenant under the provisions of this Lease) or to any leasehold improvements installed in the Premises by or on behalf of Tenant, all of which damage, replacement or repair shall be undertaken and completed by Tenant promptly.

-21-

(May 22, 2003)

If, as the result of Casualty, the Premises are rendered partially or totally untenantable, Annual Basic Rental, Tenant's Occupancy Charge and Additional Rental shall be abated proportionately as to the portion of the Premises rendered untenantable and continuing to be untenantable, and the Breakpoint shall be proportionately reduced until the Premises are tenantable.

Section 14.2.    Landlord's and Tenant's Option to Terminate Lease.

Landlord may elect to terminate this Lease if, as the result of a Casualty, the Premises are (a) rendered wholly untenantable, or (b) damaged as a result of any cause which is not covered by Landlord's insurance or (c) damaged or destroyed in whole or in part during the last three (3) years of the Term, or if Landlord's Building or the individual building in which Tenant is located is damaged to the extent of fifty percent (50%) or more of the leasable floor area contained therein (excluding Anchors), by giving to Tenant notice of such election within ninety (90) days after the occurrence of such event; provided, however, that Landlord shall only exercise such right in the event that (i) Landlord elects not to rebuild the Premises and does not commence rebuilding of the Premises within one (1) year after the date of such Casualty, and (ii) Landlord terminates the leases of all other retail tenants in Landlord's Building or the individual building in which Tenant is located similarly affected by such Casualty.

Tenant may elect to terminate this Lease if, as the result of a Casualty,

(x)     the Premises are damaged in whole or in part and are thereby rendered wholly untenantable for a period of time exceeding twenty (20) consecutive days during the last three (3) years of the Term, by giving Landlord written notice of such termination within thirty (30) days after the date of such Casualty, or

(y)     Landlord does not commence to repair, restore or rebuild the Premises within six (6) months after the occurrence of any such Casualty, by giving Landlord written notice of such termination within thirty (30) days after the expiration of said period and provided Landlord does not commence to repair the Premises within thirty (30) days of said notice.

In the event this Lease is terminated pursuant to the foregoing, both parties, subject to Section 20.21 hereof, will be relieved of all obligations under this Lease except those obligations occurring or accruing prior to the date of such termination, and Rental shall be adjusted as of such termination date.

Section 14.3.    Demolition of Landlord's Building.

In addition to Landlord's termination rights described in Section 14.2, if Landlord's Building or the individual building in which the Premises are located shall be so substantially damaged that it is reasonably necessary, in Landlord's sole judgment, to demolish same for the purpose of reconstruction, Landlord may demolish the same, in which event the Rental shall be abated to the same extent as if the Premises were rendered untenantable by a Casualty .

Section 14.4.    Insurance Proceeds.

If Landlord does not elect to terminate this Lease pursuant to Section 14.2, Landlord shall, subject to the prior rights of any Mortgagee, disburse and apply any insurance proceeds received by Landlord to the restoration and rebuilding of Landlord's Building in accordance with Section 14.1 hereof. All insurance proceeds payable with respect to the Premises (excluding proceeds payable to Tenant pursuant to Section 13.3) shall belong to and shall be payable to Landlord and shall be applied toward the restoration of the Premises to substantially the same condition as existed prior to such damage.

-22-

(May 22, 2003)

ARTICLE XV
CONDEMNATION

Section 15.1.    Effect of Taking.

If any part of the Premises shall be taken under the power of eminent domain, this Lease shall terminate on the date Tenant is required to yield possession thereof.  If twenty percent (20%) or more of the leasable floor area contained in Landlord's Building or the individual building in which the Premises are located is so taken, or if parking spaces in the Project are so taken thereby reducing the number of parking spaces to less than the number required by law and Landlord does not deem it reasonably feasible to replace such parking spaces with other parking spaces on the portion of the Project not taken, then Landlord may elect to terminate this Lease as of the date on which possession thereof is required to be yielded to the condemning authority, by giving notice of such election within ninety (90) days after such date.  If any notice of termination is given pursuant to this Section, this Lease and the rights and obligations of the parties hereunder shall cease as of the date of such notice and Rental shall be adjusted as of the date of such termination.

Section 15.2.    Condemnation Awards.

All compensation awarded for any taking of the Premises, Landlord's Building, Landlord's Property, or any interest in any of the same, shall belong to and be the property of Landlord, Tenant hereby assigning to Landlord all rights with respect thereto; provided, however, nothing contained herein shall prevent Tenant from applying for reimbursement from the condemning authority (if permitted by law) for moving expenses, or the expense of removal of Tenant's trade fixtures, or loss of Tenant's business good will, but only if such action shall not reduce the amount of the award or other compensation otherwise recoverable from the condemning authority by Landlord or the owner of the fee simple estate in Landlord's Property.  Notwithstanding the foregoing, Landlord shall pay Tenant that portion of any net (of collection expenses) award or payment received by Landlord attributable to the unamortized value of Tenant's leasehold improvements, erected at Tenant's expense in the Premises, if permitted by Landlord's Mortgagee, any ground lease and law, based on straight-line depreciation from installation until the Termination Date, to the extent such funds are so permitted to be paid.  In order to give effect to the immediately preceding sentence, Tenant shall, within sixty (60) days after opening for business in the Premises, notify Landlord in writing as to the value of its leasehold improvements (excluding any cash allowances or monies contributed by Landlord to Tenant).

ARTICLE XVI
ASSIGNMENT AND SUBLETTING

Section 16.1.    Landlord's Consent Required.

(a)  Except as provided in Sections 16.1.(b) or 17.4 with respect to assignment of this Lease following Tenant's bankruptcy, Tenant will not assign this Lease, in whole or in part, nor sublet all or any part of the Premises, nor license concessions or lease departments therein, nor pledge or encumber by mortgage or other instruments its interest in this Lease (each individually and collectively referred to in this Article as a "Transfer") without first obtaining the consent of Landlord, which consent Landlord may withhold in its sole and absolute discretion.  This prohibition includes, without limitation, any Transfer which would otherwise occur by operation of law, merger, consolidation, reorganization, transfer or other change of Tenant's corporate, partnership or proprietary structure or ownership.  Any Transfer to or by a receiver or trustee in any federal or state bankruptcy, insolvency, or similar proceeding shall be subject to, and in accordance with, the provisions of Section 17.4.  Consent by Landlord to any Transfer shall not constitute a waiver of the requirement for such consent to any subsequent Transfer.  Notwithstanding the foregoing, sale of stock over a nationally recognized security exchange shall not be deemed a Transfer for the purposes of this Lease.

-23-

(May 22, 2003)

(b)    Notwithstanding the general prohibition against Transfer contained in Section 16.1(a), provided Tenant is not in default under any of the terms and conditions of this Lease, and further provided that Tenant has fully and faithfully performed all of the terms and conditions of this Lease, (i) Tenant shall have the right, without Landlord's consent but with written notice to Landlord at least thirty (30) days prior to such assignment, to assign this Lease to any parent, subsidiary or affiliate entity of Tenant, or to the surviving entity in connection with a merger, consolidation or acquisition between Tenant and its parent or any of its subsidiaries for any of the then remaining portion of the unexpired Term, and (ii) Landlord will not unreasonably withhold consent to any other Transfer;

provided, in each instance of (i) or (ii):

(A)    the net worth of the assignee, licensee, sublessee or other transferee (each a "Transferee") immediately prior to the Transfer shall not be less than the greater of the net worth of Tenant immediately prior to the Transfer or the net worth of Tenant at the time of the signing of this Lease, as evidenced by audited financial statements;

(B)    such Transferee shall continue to operate the business conducted in the Premises under the same Tenant Trade Name, in the same manner as Tenant and pursuant to all of the provisions of this Lease;

(C)    such Transferee shall assume in writing, in a form acceptable to Landlord, all of Tenant's obligations hereunder and Tenant shall provide Landlord with a copy of such assumption/transfer document;

(D)    Tenant to which the Premises were initially leased shall continue to remain liable under this Lease for the performance of all terms, including, but not limited to, payment of Rental due under this Lease; and

(E)    Tenant's guarantor, if any, shall continue to remain liable under the terms of the Guaranty of this Lease and, if Landlord deems it necessary, such guarantor shall execute such documents necessary to insure the continuation of its guaranty.

If the proposed Transfer is a Transfer under (i) above, if at any time following the Transfer the parent, subsidiary or affiliate of Tenant to which this Lease was assigned ceases to be a parent, subsidiary or affiliate of Tenant, such event shall constitute a Transfer requiring Landlord's consent hereunder.

If the proposed Transfer is a Transfer under (ii) above, the following additional conditions shall apply:

(F)    such Transfer shall involve all or substantially all of Tenant or its assets;

(G)    such Transfer shall not adversely affect the quality and type of business operation which Tenant has conducted theretofore;

(H)    such Transferee shall possess qualifications to conduct the Tenant business substantially equivalent to those of Tenant and shall have demonstrated recognized experience in successfully operating such a business, including, without limitation, experience in successfully operating a similar quality business in first-class projects;

(I)    Tenant shall pay to Landlord Additional Rental of One Thousand Dollars ($1,000.00) prior to the effective date of the Transfer in order to reimburse Landlord for all of its internal costs and expenses incurred with respect to the Transfer;

- 24 -

(May 22, 2003)

(J)     as of the effective date of the Transfer and continuing throughout the remainder of the Term, the Annual Basic Rental shall be the greater of (x) the Annual Basic Rental set forth in Section 1.1.G hereof, or (y) the sum of all Annual Basic Rental and all Annual Percentage Rental payable by Tenant during the twelve calendar months preceding the transfer;

(K)     Landlord shall receive upon execution of its consent the repayment of any construction or other allowances given to the original Tenant as provided elsewhere in this Lease, any due but unpaid Rental, and an amount equal to fifteen percent (15%) of any and all consideration paid or agreed to be paid, directly or indirectly, to Tenant for such Transfer or for the sale of Tenant's business in connection with which any such Transfer is made; and

(L)     if such consent is required, Landlord's Mortgagee(s) shall have consented in writing to such Transfer.

Section 16.2.    Acceptance of Rent from Transferee.

The acceptance by Landlord of the payment of Rental following any Transfer prohibited by Section 16.1 shall not be deemed to be a consent by Landlord to any such Transfer nor shall the same be deemed to be a waiver of any right or remedy of Landlord hereunder.

Section 16.3.    Additional Provisions Respecting Transfers.

Without limiting Landlord's right to withhold its consent to any Transfer by Tenant, and regardless of whether Landlord shall have consented to any such Transfer, neither Tenant nor any other person having an interest in the possession, use or occupancy of the Premises or any part thereof shall enter into any lease, sublease, license, concession, assignment or other transfer or agreement for possession, use or occupancy of all or any portion of the Premises which provides for rental or other payment for such use, occupancy or utilization based, in whole or in part, on the net income or profits derived by any person or entity from the space so leased, used or occupied, and any such purported lease, sublease, license, concession, assignment or other transfer or agreement shall be absolutely void and ineffective as a conveyance of any right or interest in the possession, use or occupancy of all or any part of the Premises. There shall be no deduction from the rental payable under any sublease or other transfer nor from the amount thereof passed on to any person or entity, for any expenses or costs related in any way to the subleasing or transfer of such space.

If Tenant shall make or suffer any such Transfer without first obtaining any consent of Landlord required by Section 16.1, any and all amounts received as a result of such Transfer shall be the property of Landlord to the extent the same (determined on a square foot basis) is greater than the Annual Basic Rental (on a square foot basis) payable under this Lease, it being the parties' intent that any profit resulting from such Transfer shall belong to Landlord, but the same shall not be deemed to be a consent by Landlord to any such Transfer or a waiver of any right or remedy of Landlord hereunder.

ARTICLE XVII
DEFAULT

Section 17.1.    "Event of Default" Defined.

Any one or more of the following events shall constitute an "Event of Default":

-25-

(May 22, 2003)

(a)    The failure of Tenant to pay any Rental or other sum of money within ten (10) days after the same is due hereunder; provided, however, Landlord shall give Tenant ten (10) days' notice of late payment of Rental once only in any Rental Year during the Term before such late payment shall constitute an Event of Default hereunder.  Upon the second and subsequent such occurrence in any Rental Year, Landlord shall have the right to proceed against Tenant and the Premises without such notice.

(b)    Default by Tenant in the performance or observance of any covenant or agreement of this Lease (other than a default involving the payment of money), which default is not cured within fifteen (15) days after the giving of notice thereof by Landlord, unless such default is of such nature that it cannot be cured within such fifteen (15) day period, in which case no Event of Default shall occur so long as Tenant shall, with notice to Landlord, commence the curing of the default within such fifteen (15) day period and shall thereafter diligently prosecute the curing of same; provided, however, if Tenant shall default in the performance of the same covenant or the same provision of this Lease two (2) or more times in any twelve (12) month period, then notwithstanding that each of such defaults shall have been cured by Tenant, any further similar default shall be deemed an Event of Default without the ability for cure.

(c)    The unauthorized vacation or abandonment of the Premises by Tenant at any time following delivery of possession of the Premises to Tenant.

(d)    The sale of Tenant's interest in the Premises under attachment, execution or similar legal process, or the admission in writing by Tenant of its inability to pay its debts when due or the making by Tenant of an assignment for the benefit of creditors, or the appointment of a receiver or Trustee for the business or property of Tenant, unless such appointment shall be vacated within thirty (30) days of its entry.

(e)    The commencement of a case under the Federal Bankruptcy Code by or against Tenant or any guarantor of Tenant's obligations hereunder, or the filing of a voluntary or involuntary petition proposing the adjudication of Tenant or any such guarantor as bankrupt or insolvent under any state or federal bankruptcy or insolvency law, or an arrangement by Tenant or any such guarantor with its creditors, unless the petition is filed by a party other than Tenant or any guarantor and is withdrawn or dismissed within sixty (60) days after the date of its filing.

(f)    The occurrence of any other event described elsewhere in this Lease as constituting an "Event of Default".

Section 17.2.    <u>Remedies</u>.

Upon the occurrence of an Event of Default, Landlord, may do any one or more of the following:

(a)    Enter the Premises and take possession of any and all personal property lawfully belonging to Tenant, whether exempt or not from sale under execution or attachment (it being agreed that said property shall at all times be bound with a lien in favor of Landlord and shall be chargeable for all Rental and for the fulfillment of the other covenants and agreements herein contained), and Landlord may sell all or any part thereof at public or private sale under commercially reasonable standards.  Tenant agrees that five (5) days prior notice of any public or private sale shall constitute reasonable notice.  The proceeds of any such sale shall be applied, first, to the payment of all costs and expenses of conducting the sale or storing said property; second, toward the payment of any Rental, which may be or may become due from

-26-

(May 22, 2003)

Tenant to Landlord; and third, to pay Tenant, on demand, any surplus remaining after all Rental has been fully paid.

(b)     Perform, on behalf and at the expense of Tenant, any obligation of Tenant under this Lease which Tenant has failed to perform and of which Landlord shall have given Tenant fifteen (15) days notice, the cost of which performance by Landlord, together with interest thereon at the Default Rate from the date of such expenditure, shall be deemed Additional Rental and shall be payable by Tenant to Landlord upon demand.

(c)     Elect to terminate this Lease and the tenancy created hereby by giving notice of such election to Tenant, and reenter the Premises, in accordance with applicable law, and remove Tenant and all other persons and property from the Premises, and may store such property in a public warehouse or elsewhere at the cost of and for the account of Tenant and without Landlord being deemed guilty of trespass or becoming liable for any loss or damage occasioned thereby.

(d)     Exercise any other legal or equitable right or remedy which it may have.

Any costs and expenses incurred by Landlord (including reasonable attorneys' fees) in enforcing any of its rights or remedies under this Lease shall be deemed to be Additional Rental and shall be repaid to Landlord by Tenant upon demand.

Section 17.3.   <u>Damages</u>.

If this Lease is terminated by Landlord pursuant to Section 17.2., subject to the ruling of a court of competent jurisdiction, Tenant nevertheless shall remain liable for (a) any Rental and damages which may be due or sustained prior to such termination, (b) all reasonable costs, fees and expenses including, but not limited to, reasonable attorneys' fees incurred by Landlord in pursuit of its remedies hereunder, or in renting the Premises to the next subsequent tenant and (c) additional damages (the "Future Rental Damages"), which, at the election of Landlord shall be either:

(i)     an amount equal to the Rental which, but for termination of this Lease, would have become due during the remainder of the Term, less the amount of Rental, if any, which Landlord shall receive during such period from others to whom the Premises may be rented (other than any Additional Rental received by Landlord as a result of any failure of such other person to perform any of its obligations to Landlord), in which case such Future Rental Damages shall be computed and payable in monthly installments, in advance, on the first day of each calendar month following termination of this Lease and continuing until the date on which the Term would have expired but for such termination, and any suit or action brought to collect any such Future Rental Damages for any month shall not in any manner prejudice the right of Landlord to collect any Future Rental Damages for any subsequent month by a similar proceeding; or

(ii)     an amount equal to the present worth (as of the date of such termination) of Rental which, but for termination of this Lease, would have become due during the remainder of the Term, less the fair rental value of the Premises, as determined by Landlord in its commercially reasonable judgment, in which case such Future Rental Damages shall be payable to Landlord in one lump sum on demand and shall bear interest at the Default Rate until paid. For purposes of this clause (ii), "present worth" shall be computed by discounting such amount to present worth at a discount rate equal to one percentage point above the discount rate then in effect at the Federal Reserve Bank nearest to the location of the Project.

(May 22, 2003)

For purposes of computing the Future Rental Damages, the Annual Percentage Rental payable with respect to each Rental Year following termination (including the Rental Year in which such termination shall take place) shall be presumed to be equal to the average Annual Percentage Rental payable with respect to each Rental Year preceding termination and Gross Sales shall be extrapolated for any partial Rental Year.

If this Lease is terminated pursuant to Section 17.2, Landlord shall use reasonable efforts to relet the Premises so as to mitigate damages provided any such reletting shall be on terms reasonably acceptable to Landlord, and if there is other vacant space in the Project, Landlord may give priority to the leasing of such vacant space instead of the Premises. Landlord shall not be obligated to incur any out-of-pocket expense in connection with its efforts to relet the Premises.

Nothing contained in this Lease shall limit or prejudice the right of Landlord to prove for and obtain, in proceedings for the termination of this Lease by reason of bankruptcy or insolvency, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, the damages are to be proved, whether or not the amount be greater, equal to, or less than the amount of the loss or damages referred to above. The failure or refusal of Landlord to relet the Premises or any part or parts thereof shall not release or affect Tenant's liability for damages.

Section 17.4.    Remedies in Event of Bankruptcy or Other Proceeding.

In addition to Landlord's rights and remedies established by law or set forth elsewhere in this Lease, including without limitation Section 17.1, upon the occurrence of any event described in Sections 17.1(d) or (e), Landlord shall have the following rights and remedies with respect to Tenant or Tenant as debtor-in-possession or the trustee appointed in any such proceeding (being collectively referred to as "Tenant" only for the purposes of this Section 17.4):

(a)    Within twenty (20) days of the occurrence of any event described in Sections 17.1(d) and (e), Tenant shall deposit with Landlord or a financial institution reasonably acceptable to Landlord, a sum equal to three (3) months' Rental for the Premises, to be utilized by Landlord as partial adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease;

(b)    All provisions of this Lease governing the payment of interest and late charges are fully applicable to all Rental accruing during any event described in Sections 17.1 (d) and (e);

(c)    If Tenant assumes this Lease and proposes to assign the same (pursuant to Title 11 U.S.C. § 365, or as the same may be amended) then notice of such proposed assignment, setting forth (x) the name and address of such person, (y) all of the terms and conditions of such offer, and (z) the adequate assurance to be provided to Landlord including, without limitation, the assurances referred to in Title 11 U.S.C. § 365(b)(3), as it may be amended, must be provided to Landlord no later than thirty (30) days prior to the date that Tenant shall make application to such court for approval to enter into such assignment and assumption, and Landlord shall thereupon have the prior right and option, to be exercised by notice to Tenant given at any time prior to the effective date of such proposed assignment, to accept, or to cause Landlord's designee to accept, an assignment of this Lease upon the same terms and conditions and for the same consideration, if any, as the bona fide offer made by such person less any brokerage commissions which may be payable out of the consideration to be paid by such person for the assignment of this Lease.

(d)    If Tenant assumes this Lease and proposes to assign the same, and Landlord does not exercise its option pursuant to paragraph (c) of this Section 17.4, in addition to all of Landlord's rights

- 28 -

(May 22, 2003)

and remedies established by law or set forth elsewhere in this Lease, Tenant hereby agrees that:

    (i)    such assignee shall assume in writing on Landlord's standard form all of the terms, covenants and conditions of this Lease and such assignee shall provide Landlord with assurances satisfactory to Landlord that it has the experience in operating stores having the same or substantially similar uses as the Permitted Use, in similar number of total stores and in the same general geographic area as Tenant prior to the commencement of any event described in Sections 17.1(d) and (e), in first-class projects, sufficient to enable it so to comply with the terms, covenants and conditions of this Lease and successfully operate the Premises without diminution in Gross Sales;

    (ii)    such assignee shall, at Landlord's discretion, pay to Landlord or post to Landlord's benefit an unconditional letter of credit in an amount equal to six (6) months' Rental under this Lease; and

    (iii)    if such assignee makes any payment to Tenant, or for Tenant's account, for the right to assume this Lease (including, without limitation, any lump sum payment, installment payment or payment in the nature of rent over and above the Rental payable under this Lease), Tenant shall pay over to Landlord one-half (1/2) of any such payment.

    (e)    All Rental shall be deemed "rent reserved" under this Lease for purposes of any claim made by Landlord, including without limitation, claims pursuant to Section 502(b)(6) of the Bankruptcy Code; and

    (f)    All reasonable costs and fees of attorneys and other professionals expended by Landlord as a result of any of the events described in Sections 17.1(d) and (e) or in this Section shall be repaid to Landlord by Tenant upon demand.

ARTICLE XVIII
SUBORDINATION AND ATTORNMENT

Section 18.1.    <u>Subordination</u>.

    Unless a Mortgagee (as hereinafter defined) shall otherwise elect as provided in Section 18.2, Tenant's rights under this Lease are and shall remain subject and subordinate to the operation and effect of any mortgage, deed of trust or other security instrument constituting a lien upon the Premises or Landlord's interest therein, or any lease of land and/or building(s) to Landlord involving the Premises, whether the same shall be in existence at the date hereof or created hereafter, any such lease, mortgage, deed of trust or other security instrument being referred to herein as a "Mortgage", and the party or parties having the benefit of the same, whether as lessor, mortgagee, trustee or noteholder, being referred to herein as a "Mortgagee". Tenant's acknowledgment and agreement of subordination provided for in this Section are self-operative; however, Tenant shall execute the Subordination, Non-Disturbance and Attornment Agreement attached to this Lease at the same time that it executes this Lease, and any such further assurances as may, during the Term of this Lease, be requested by Landlord or any Mortgagee.

    Section 18.2.    <u>Mortgagee's Unilateral Subordination</u>.

-29-

(May 22, 2003)

If a Mortgagee shall so elect by notice to Tenant or by the recording of a unilateral declaration of subordination, this Lease and Tenant's rights hereunder shall be superior and prior in right to the Mortgage of which such Mortgagee has the benefit, with the same force and effect as if this Lease had been executed, delivered and recorded prior to the execution, delivery and recording of such Mortgage, subject, nevertheless, to such conditions as may be set forth in any such notice or declaration.

Section 18.3.    Attornment.

If any person shall succeed to all or part of Landlord's interest in the Premises, whether by purchase, foreclosure, deed in lieu of foreclosure, power of sale, termination of lease or otherwise, and if so requested or required by such successor in interest, Tenant shall attorn to such successor in interest and shall execute such agreement in confirmation of such attornment as such successor in interest shall reasonably request, provided such successor-in-interest agrees to assume all of Landlord's obligations under this Lease occurring subsequent to its succession.  If such successor-in-interest is the holder or former holder of a Mortgage, Tenant agrees that any claim it may have against Landlord relating to any event occurring before the date of attornment may not be asserted against the successor-in-interest nor may Tenant offset the amount of any such claim against Rental payable hereunder; provided that the successor-in-interest will be obligated to correct any conditions that existed as of the date of attornment which violate the successor-in-interest's obligations as landlord under this Lease.

ARTICLE XIX
NOTICES

Section 19.1.    Sending of Notices.

Any notice, request, demand, approval or consent given or required to be given under this Lease shall be in writing and shall be deemed to have been given on the earlier to occur of:

(a)      the date of actual delivery; or

(b)      the third day following the day on which the same shall have been (i) mailed by United States registered or certified mail or express mail, return receipt requested, with all postage charges prepaid or (ii) deposited with a recognized delivery service.

Any notice to Tenant shall be addressed to the Tenant Notice Address and any notice to Landlord (but not the payment of Rental or delivery of sales reports) shall be addressed to Landlord, Attention:  General Counsel, c/o The Rouse Company, 10275 Little Patuxent Parkway, Columbia, Maryland 21044, with a copy to Landlord's management office in the Project.

Either party may, at any time, change its address for the above purposes by sending a notice to the other party stating the change and setting forth the new address.

Section 19.2.    Notice to Mortgagees.

If any Mortgagee or Landlord on behalf of any Mortgagee shall notify Tenant that it is the holder of a Mortgage affecting the Premises, no notice, request or demand thereafter sent by Tenant to Landlord shall be effective against such Mortgagee unless and until a copy of the same shall also be sent to such Mortgagee in the manner prescribed in Section 19.1 and to such address as such Mortgagee or Landlord shall designate.

ARTICLE XX

-30-

(May 22, 2003)

## MISCELLANEOUS

Section 20.1.  Radius Restriction.

Tenant agrees that Tenant (and if Tenant is a corporation, partnership or limited liability company, its stockholders, any affiliates, partners or members) shall not at any time during the Term of this Lease or any extension(s) thereof, directly or indirectly, operate, manage or have any interest in any other store or business within the Restriction Area (unless in operation on the date of this Lease) which is similar to or in competition with the Permitted Use. Without limiting any of Landlord's remedies under this Lease, in the event Tenant operates, manages or has any interest in a store or business violating the provisions of this Section, then, at Landlord's option, Landlord may by notice to Tenant require Tenant to include the gross sales of such other store or business in the Gross Sales of the Premises for the purposes of calculating Annual Percentage Rental under this Lease.

Section 20.2.    Estoppel Certificates.

At any time and from time to time, within fifteen (15) days after Landlord shall request the same, Tenant will execute, acknowledge and deliver to Landlord and to such Mortgagee or other party as may be designated by Landlord, a certificate in a form reasonably acceptable to the requesting party with respect to the matters required by such party (or in the form requested by Landlord and attached hereto as Exhibit 1) and such other matters relating to this Lease or the status of performance of obligations of the parties hereunder as may be reasonably requested by such party. If Tenant fails to provide such certificate within fifteen (15) days after request by Landlord, Tenant shall be deemed to have approved the contents of any such certificate submitted to Tenant by Landlord and Landlord is hereby authorized to so certify.

At any time and from time to time, within fifteen (15) days after Tenant shall request the same, Landlord will execute, acknowledge and deliver to Tenant, or such other party as may be designated by Tenant, a certificate setting forth the commencement and termination dates of this Lease, the amount of Rental payable by Tenant hereunder and the nature, if any, of any Event of Default existing as of the date of such certificate.

Section 20.3.    Inspections and Access by Landlord.

Tenant will permit Landlord, its agents, employees and contractors to enter all parts of the Premises during Tenant's business hours to inspect the same and to enforce or carry out any provision of this Lease, including, without limitation, any access necessary for the making of any repairs which are Landlord's obligation hereunder; provided, however, that, in the event of an emergency, Landlord may enter the Premises for such purposes at any time. Any such entry shall be upon such notice, if any, as shall be feasible under the circumstances and shall be made so as to reasonably minimize the disruption of Tenant's use of the Premises.

Section 20.4.    Memorandum of Lease.

Neither this Lease nor a short form or memorandum thereof shall be recorded in the public records.

Section 20.5.    Remedies Cumulative.

No reference to any specific right or remedy shall preclude either party from exercising any other right or from having any other remedy or from maintaining any action to which it may otherwise be entitled at law or in equity. No failure by either party to insist upon the strict performance of any agreement, term, covenant or condition hereof, or to exercise any right or remedy consequent upon a breach thereof, and no acceptance of full or partial rent during the continuance of any such breach, shall constitute a waiver of any such breach, agreement, term, covenant or condition. No waiver by either party of any breach by the other party under this

-31-

Lease or a waiver by Landlord of any breach by any other tenant under any other lease of any portion of the Project shall affect this Lease in any way whatsoever.

Section 20.6.    Successors and Assigns.

This Lease and the covenants and conditions herein contained shall inure to the benefit of and be binding upon Landlord, its successors and assigns, and shall be binding upon Tenant, its successors and assigns and shall inure to the benefit of Tenant and its permitted assigns and subtenants.  Upon any sale or other transfer by Landlord of its interest in the Premises and in this Lease, and the assumption by Landlord's transferee of the obligations of Landlord hereunder, Landlord shall be relieved of any obligations under this Lease accruing thereafter.

Section 20.7.    Captions and Headings.

The table of contents and the Article and Section captions and headings are for convenience of reference only and in no way shall be used to construe or modify the provisions set forth in this Lease.

Section 20.8.    Joint and Several Liability.

If two or more individuals, corporations, partnerships or other business associations (or any combination of two or more thereof) shall sign this Lease as Tenant, the liability of each such individual, corporation, partnership or other business association to pay rent and perform all other obligations hereunder shall be deemed to be joint and several and all notices, payments and agreements given or made by, with or to any one of such individuals, corporations, partnerships or other business associations shall be deemed to have been given or made by, with or to all of them.  In like manner, if Tenant shall be a partnership or other business association, the members of which are, by virtue of statute or federal law, subject to personal liability, the liability of each such member shall be joint and several.

Section 20.9.    Broker's Commission.

Each of the parties represents and warrants that there are no claims for brokerage commissions or finders' fees in connection with the execution of this Lease, and agrees to indemnify the other against, and hold it harmless from, all liability arising from any such claim including, without limitation, the cost of counsel fees in connection therewith.

Section 20.10.    No Discrimination.

It is Landlord's policy to comply with all applicable state and federal laws prohibiting discrimination in employment based on race, age, color, sex, national origin, disability, religion, or other protected classification.  It is further intended that the Project shall be developed and operated so that all prospective tenants thereof, and all customers, employees, licensees and invitees of all tenants shall have equal opportunity to obtain all the goods, services, accommodations, advantages, facilities and privileges of the Project without discrimination because of race, age, color, sex, national origin, disability, or religion.  To that end, Tenant shall not discriminate in the conduct and operation of its business in the Premises against any person or group of persons because of the race, age, color, sex, religion, national origin or other protected classification of such person or group of persons.

Section 20.11.    No Joint Venture.

Any intention to create a joint venture or partnership relation between the parties hereto is hereby expressly disclaimed.  The provisions of this Lease in regard to the payment by Tenant and the acceptance by

(May 22, 2003)

Landlord of a percentage of Gross Sales of Tenant and others is a reservation for rent for the use of the Premises.

Section 20.12.  No Option.

The submission of this Lease for examination does not constitute a reservation of or option for the Premises, and this Lease shall become effective only upon execution and delivery thereof by both parties. Execution by signature of an authorized officer of Landlord or any corporate entity acting on behalf of Landlord shall be effective only upon attestation thereof by a corporate Secretary or Assistant Secretary of Landlord.

Section 20.13.  No Modification.

This writing is intended by the parties as a final expression of their agreement and as a complete and exclusive statement of the terms thereof, all negotiations, considerations and representations between the parties having been incorporated herein.  No course of prior dealings between the parties or their officers, employees, agents or affiliates shall be relevant or admissible to supplement, explain or vary any of the terms of this Lease.  Acceptance of, or acquiescence in, a course of performance rendered under this or any prior agreement between the parties or their affiliates shall not be relevant or admissible to determine the meaning of any of the terms of this Lease.  No representations, understandings or agreements have been made or relied upon in the making of this Lease other than those specifically set forth herein.  This Lease can be modified only by a writing signed by the both parties.

Section 20.14.  Severability.

If any portion of any term or provision of this Lease, or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

Section 20.15.  Third Party Beneficiary.

Nothing contained in this Lease shall be construed so as to confer upon any other party the rights of a third party beneficiary except rights contained herein for the benefit of a Mortgagee.

Section 20.16.  Applicable Law.

This Lease and the rights and obligations of the parties hereunder shall be construed in accordance with the laws of the State in which the Project is located.

Section 20.17.  Performance of Landlord's Obligations by Mortgagee.

Tenant shall accept performance of any of Landlord's obligations hereunder by any Mortgagee of Landlord.

Section 20.18.  Waiver of Certain Rights.

Landlord and Tenant hereby mutually waive any and all rights which either may have to request a jury trial in any action, proceeding or counterclaim (except for those involving personal injury or property damage suffered by third parties) arising out of or relating in any way to this Lease or Tenant's occupancy of or right

-33-

(May 22, 2003)

to occupy the Premises; provided, however, Tenant shall only be obligated to waive its right to a jury trial in the event of a monetary Event of Default or holding over.

Tenant further agrees that in the event Landlord commences any summary proceeding for non-payment of rent or possession of the Premises, Tenant will not interpose and hereby waives all right to interpose any non-compulsory counterclaim of whatever nature in any such proceeding. Tenant further waives any right to remove said summary proceeding to any other court or to consolidate said summary proceeding with any other action, whether brought prior or subsequent to the summary proceeding.

Section 20.19.    Limitation on Right of Recovery Against Landlord.

Tenant acknowledges and agrees that the liability of Landlord under this Lease shall be limited to its interest in Landlord's Property and any judgments rendered against Landlord shall be satisfied solely out of the proceeds of sale of its interest in Landlord's Property. No personal judgment shall lie against Landlord upon extinguishment of its rights in Landlord's Property and any judgment so rendered shall not give rise to any right of execution or levy against Landlord's assets. The provisions hereof shall inure to Landlord's successors and assigns including any Mortgagee. The foregoing provisions are not intended to relieve Landlord from the performance of any of Landlord's obligations under this Lease, but only to limit the personal liability of Landlord in case of recovery of a judgment against Landlord; nor shall the foregoing be deemed to limit Tenant's rights to obtain injunctive relief or specific performance or to avail itself of any other right or remedy which may be awarded Tenant by law or under this Lease.

Section 20.20.    Relocation or Termination.

If in connection with Landlord's expansion or renovation of existing improvements or construction of new improvements (in each instance, "Landlord's Construction"), Landlord determines that it is necessary that Tenant vacate the Premises or that the Premises be altered, Landlord may require that Tenant surrender possession of all or a portion of the Premises temporarily or permanently. In such event, Landlord, in its sole and absolute discretion, may either (a) offer to amend this Lease to (i) make the changes associated with the change in Tenant's Floor Area caused by an alteration and/or (ii) lease Tenant other comparable premises, reasonably acceptable to Tenant, within the Project on the same terms and conditions as those contained in this Lease either on a temporary basis or for the balance of the remaining Term, or (b) terminate this Lease and pay Tenant an amount equal to the unamortized net cost to Tenant of its leasehold improvements in the Premises, calculated using a straight-line amortization schedule and an amortization period equal to the Lease Term. If Landlord offers to amend this Lease in accordance with (a), Landlord shall present a proposed amendment to Tenant reflecting the change in the Tenant's Floor Area and/or the relocated Premises. If the proposed amendment is not executed by Tenant and delivered to Landlord within fifteen (15) days following its presentation to Tenant, Landlord shall have the right at any time thereafter to terminate this Lease in accordance with (b). If Landlord elects to terminate this Lease pursuant to (b), Landlord shall do so by notifying Tenant in writing of its election to terminate, which notice shall specify the date as of which this Lease shall terminate, which date will be no earlier than ninety (90) days from the date of the notice. The amendment of this Lease in accordance with (a) herein or the payment of the consideration in accordance with (b) herein shall be Tenant's sole remedy in the event Tenant is required to surrender possession of the Premises as provided in this Section 20.20.

Any alteration to the Premises necessitated by Landlord's Construction will be performed by Landlord at its expense. If Tenant occupies relocated Premises in accordance with the preceding paragraph, Landlord will cause improvements to be made to such relocated Premises at Landlord's expense so that the relocated Premises will be reasonably comparable to the original Premises as they existed immediately prior to Tenant's surrender of possession thereof. Landlord will reimburse Tenant for reasonable moving expenses incurred by Tenant in moving from the original Premises to the relocated Premises (and returning to the original Premises, if applicable) within forty-five (45) days following Tenant's submission of Tenant's documented moving

(May 22, 2003)

expenses.  Rental shall be abated on a proportionate basis for any period of time that Tenant is required to surrender possession of a portion of the Premises but is able to operate in the remainder of the Premises.

      Section 20.21.   <u>Survival.</u>

      All representations, warranties, covenants, conditions and agreements contained herein which either are expressed as surviving the expiration or termination of this Lease or, by their nature, are to be performed or observed, in whole or in part, after the termination of expiration of this Lease, shall survive the termination or expiration of this Lease.

(May 22, 2003)

**THIS LEASE AGREEMENT CONTAINS IN SECTION 20.18. A MUTUAL WAIVER BY THE PARTIES OF THE RIGHT TO A JURY TRIAL IN CERTAIN ACTIONS BETWEEN THE PARTIES**.

       IN WITNESS WHEREOF, the parties hereto intending to be legally bound hereby have executed this Lease as of the day and year first above written.

ATTEST:

ROUSE F.S., LLC, Landlord
By: Rouse Property Management, Inc., Property Manager
and agent for Landlord

By: _____
_____               Vice-President
Assistant Secretary            WILLIAM Y. HECHT

ATTEST:

TALULAH G, INC., Tenant

By: _____(SEAL)
_____          President
Secretary



NOT TO SCALE

LOWER LEVEL

N

# SCHEDULE "A"

TENANT:

TALULAH G

CENTER:

FASHION SHOW MALL

(May 22, 2003)

SCHEDULE "C"
UTILITY CONSUMPTION AND PAYMENT SCHEDULE

ANNEXED TO and forming part of the Lease by and between ROUSE F.S., LLC, ("Landlord") and TALULAH G, INC., a Nevada corporation, t/a TALULAH G, ("Tenant").

Section 12.1. of the above mentioned Lease Agreement provides for the inclusion of this Schedule as the basis for the determination of electricity used by Tenant in the Premises and the payment therefore.

Landlord will provide and maintain the necessary conduits to bring electricity to the Premises. Tenant shall pay all charges for electricity used by it and supplied by Landlord, public utility or public authority, or any other person, firm or corporation.

Landlord shall have the option to supply electricity to the Premises. If Landlord shall elect to supply electricity to the Premises, Tenant will pay all charges for its requirements for such service tendered by Landlord, and Tenant will pay Landlord within ten (10) days after mailing by Landlord to Tenant of statements therefor at the applicable rates determined by Landlord from time to time which Landlord agrees shall be reasonable and not in excess of the public utility rates for the same service, if applicable, but in no event less than Landlord's actual cost.

If Landlord so elects to supply electricity, Tenant shall execute and deliver to Landlord, within ten (10) days after request therefor, any documentation reasonably required by Landlord to effect such change in the method of furnishing of electricity.

(May 22, 2003)

HVAC - A

SCHEDULE "D"
TENANT HEATING, VENTILATING AND AIR-CONDITIONING SCHEDULE

ANNEXED TO and forming part of the Lease by and between ROUSE F.S., LLC, ("Landlord") and TALULAH G, INC., a Nevada corporation, t/a TALULAH G, ("Tenant").

Section 12.1. of the above mentioned Lease provides for the inclusion of this Schedule to set forth the terms and conditions under which heating, ventilation and air-conditioning will be provided to the Premises.

A. <u>HVAC System</u>

Landlord and/or others have installed or caused the installation of a heating, ventilating and air-conditioning equipment and system serving the Premises and Landlord's Building (the "HVAC System"). Tenant shall have the use of that portion of the HVAC System in the Premises upon Tenant's acceptance of the Premises. Tenant will install a sheet metal duct system in the Premises, as approved by Landlord. Landlord and Tenant each shall be responsible for the operation of their respective portions of the HVAC System<DELETED ELEMENT>. Landlord shall maintain, repair and operate the HVAC System at its expense, but subject to the payment by Tenant of the charges provided for in this Schedule. Upon the expiration or termination of the Lease, title to the HVAC System and any additions or replacements thereto, shall remain in and vest solely in Landlord.

B. <u>Tenant's HVAC Charge</u>

In each calendar month of the Term Tenant shall pay Landlord as Additional Rental, Tenant's proportionate share of Landlord's cost of the energy and utilities used in the ventilation of Landlord's Floor Area ("Tenant's HVAC Charge") which shall be determined as follows:

(a)    Landlord, or a heating, ventilating and air-conditioning consultant designated by Landlord, will review such data and information regarding the mechanical capacity of that portion of the HVAC System serving the Premises as shall be deemed relevant and, based on such data and information, Landlord or such consultant shall assign to Tenant an "HVAC Factor" which shall fairly represent the relationship between (x) the mechanical capacity of that portion of the HVAC System serving the Premises and (y) the total mechanical capacity of the HVAC System.

(b)    In each calendar year, the aggregate actual cost to Landlord of the energy and utilities used in heating, ventilating and air-conditioning Landlord's Floor Area ("Landlord's HVAC Cost"), shall be multiplied by a fraction, the numerator of which is Tenant's HVAC Factor and the denominator of which is the total of all HVAC Factors assigned to Landlord's Leased Floor Area. The product thus obtained shall be Tenant's HVAC Charge for such calendar year.

Tenant's HVAC Charge for each calendar month shall be paid by Tenant in such amounts as are estimated and billed by Landlord, each such charge being estimated and billed as of the first day of each calendar year. At any time during each calendar year, Landlord may reestimate Tenant's HVAC Charge and adjust Tenant's monthly installments payable during such calendar year to reflect more accurately Tenant's HVAC Charge. Within one hundred twenty (120) days after the termination of each calendar year, Landlord will send Tenant a notice which shall set forth the amount of Tenant's HVAC Charge based upon Landlord's energy, and utility bills.

-1-

(May 22, 2003)

      Tenant's HVAC Charge paid for such calendar year shall be adjusted between Landlord and Tenant, the parties hereby agreeing that Tenant shall pay Landlord or Landlord shall credit to Tenant's account (or if such adjustment is at the end of the Term, Landlord shall pay Tenant), as the case may be, within thirty (30) days of such notification to Tenant, the amounts necessary to effect such adjustment.  Failure of Landlord to provide the notification called for hereunder within the time prescribed shall not relieve Tenant of its obligations hereunder.

(May 22, 2003)

EXHIBIT 1

ESTOPPEL CERTIFICATE

Bank of America, N.A.,
as Administrative Agent for Itself and the Lenders
231 South LaSalle Street
12th Floor
Chicago, Illinois 60697

Rouse F.S., LLC
c/o The Rouse Company
10275 Little Patuxent Parkway
Columbia, Maryland 21044

RE:      That certain lease dated _____, _____, by and between ROUSE F.S., LLC, a Maryland limited liability company, as "Landlord", and _____, a _____corporation, as "Tenant", for a lease term which commenced on _____, _____, and will terminate on _____, _____ (the "Lease"), of the premises described in the Lease containing _____ square feet (the "Leased Premises") of the project commonly known as "Fashion Show" located in Las Vegas, Nevada (the "Project").

Gentlemen:

Tenant hereby certifies that the above description of the Lease and the Leased Premises therein demised is a true and correct description of the same and that the Lease constitutes the only agreement between Landlord and Tenant with respect to the Leased Premises, except as otherwise provided in paragraph 11 below.

Tenant hereby certifies, acknowledges and agrees as follows:

1.      The Lease is in full force and effect and has not been modified or amended by any document or agreement to which the undersigned is a party, except as otherwise provided in paragraph 11 below.  Tenant has accepted the Leased Premises and presently occupies the same.  Tenant has no set-offs, claims, or defenses to the enforcement of the Lease; and there are no periods of free rental applicable to the term of the Lease.

2.      Tenant's current Annual Basic Rental under the Lease is $_____ per square foot per annum, and is payable in equal monthly installments of $_____.

3.      Tenant's current Annual Percentage Rental under the Lease is _____ percent (__%) of Gross Sales in excess of $_____ per square foot per annum.

4.      The most recent payment of current Annual Basic Rental was for the payment due on _____, 200__, and all Annual Basic Rental and Additional Rental payable pursuant to the terms of the Lease have been paid up to said date except $_____.

5.      No Rental has been paid by Tenant more than thirty (30) days in advance of the due date under the Lease.

6.      A security deposit of $_____ has been made with Landlord.

-1-

(May 22, 2003)

7.    Tenant is entitled to the following renewal options under the Lease:    None or
_____.

8.    All required contributions by Landlord to Tenant on account of Tenant's improvements have been received except for $_____.

9.    Tenant hereby represents and warrants to Lender that, other than those contained in writing in the Lease, there have been no representations, warranties or covenants made by Landlord to Tenant, either oral or in writing.

10.    Tenant is not in default in the performance of the Lease, has not committed any breach of the Lease, no notice of default has been given to Tenant, and Tenant is not the subject of any federal or state, bankruptcy, insolvency or liquidation proceeding.

11.    Landlord is not in default in the performance of the Lease, has not committed any breach of the Lease, no notice of default has been given to Landlord, and Landlord has fulfilled all representations and warranties and all finish work on the Leased Premises required of Landlord.

12.    There have been no amendments, modifications or extensions of the Lease except as follows: None or _____.

13.    To the best of Tenant's knowledge, its use of the Leased Premises during its lease term has complied and will continue to comply with all applicable federal, state, county and local laws, rules and regulations, including environmental laws, rules and regulations.

14.    Tenant hereby acknowledges, to the best of its knowledge, that none of the current uses of existing tenants in the Project are in violation of any restrictive covenant or exclusive use provision of its Lease.

(May 22, 2003)

Dated this _____ day of _____, 200___.

Very truly yours,

[Name of Tenant], Tenant

_____

By: _____

Its: _____

-3-

(May 22, 2003)

G U A R A N T Y

ANNEXED  TO  AND  FORMING  A  PART  OF  THE  LEASE  DATED    JUN 0 6 2003

BETWEEN,  ROUSE  F.S.,  LLC,  a  Maryland    limited  liability  company

("Landlord"),  and  TALULAH  G,  INC.,  a  Nevada  corporation  t/a  TALULAH  G

("Tenant").


       The  undersigned,  JOSHUA  GRANTZ  and  MEITAL  GRANTZ  ("Guarantor"),
whose  address  is  2951  De  Silva  Drive,  Las  Vegas,  Nevada,  89121,  in
consideration  of  the  leasing  of  the  Premises  described  in  the  annexed
Lease  to  the  above  named  Tenant,  does  hereby  covenant  and  agree:

A.    That  if  Tenant  shall  default  in  the  performance  of  any  of  the
      covenants  and  obligations  of  said  Lease  on  Tenant's  part  to  be
      performed,  then  Guarantor  will  on  demand  well  and  truly  perform  the
      covenants  and  obligations  of  said  Lease  on  Tenant's  part  to  be
      performed  and  will  on  demand  pay  to  Landlord  any  and  all  sums  due
      to  Landlord,  including  all  damages  and  expenses  that  may  arise  in
      consequence  of  Tenant's  default,  and  Guarantor  does  hereby  waive  all
      requirements  of  notice  of  the  acceptance  of  this  Guaranty  and  all
      requirements  of  notice  of  breach  or  non-performance  by  Tenant.

B.    That  Guarantor  may,  at  Landlord's  option,  be  joined  in  any  action
      or  proceeding  commenced  by  Landlord  against  Tenant  in  connection
      with  and  based  upon  any  covenants  and  obligations  in  said  Lease,  and
      Guarantor  waives  any  demand  by  Landlord  and/or  prior  action  by
      Landlord  of  any  nature  whatsoever  against  Tenant.

C.    That  this  Guaranty  shall  remain  and  continue  in  full  force  and
      effect  as  to  any  renewal,  extension,  modification  or  amendment  of
      said  Lease  and  as  to  any  assignee  of  Tenant's  interest  in  said
      Lease,  and  Guarantor  waives  notice  of  any  and  all  such  renewals,
      extensions,  modifications,  amendments  or  assignments.

D.    That  Guarantor's  obligations  hereunder  shall  remain  fully  binding
      although  Landlord  may  have  waived  one  or  more  defaults  by  Tenant,
      extended  the  time  of  performance  by  Tenant,  released,  returned  or
      misapplied  other  collateral  given  later  as  additional  security
      (including  other  guaranties)  or  released  Tenant  from  the  performance
      of  its  obligations  under  such  Lease.

E.    That  this  Guaranty  shall  remain  in  full  force  and  effect
      notwithstanding  the  institution  by  or  against  Tenant  of  bankruptcy,
      reorganization,  readjustment,  receivership  or  insolvency  proceedings
      of  any  nature,  or  the  disaffirmance  of  said  Lease  in  any  such
      proceedings  or  otherwise.

-1-

(May 22, 2003)

F.   That if this Guaranty is signed by more than one party, their
     obligations shall be joint and several and the release of one of
     such Guarantors shall not release any other of such Guarantors.

G.   That the Guarantor or Guarantors hereby waive all suretyship
     defenses generally, and the right to petition for the marshalling
     of assets.

H.   That this Guaranty shall be applicable to and inure to the benefit
     of Landlord, its successors and assigns and shall be binding upon
     the heirs, representatives, successors and assigns of Guarantor.

I.   That Guarantor hereby waives any and all rights which it may have
     to request a jury trial in any action or proceeding, at law or in
     equity, on any and every matter arising out of or relating in any
     way to this Guaranty and the Lease.

     IN WITNESS WHEREOF, the undersigned has executed this Guaranty this
     day of   JUN 0 6 2003          ,        .

WITNESS:                              JOSHUA GRANTZ, Guarantor


_____               _____

WITNESS:                              MEITAL GRANTZ, Guarantor


_____               _____

- 2 -

(May 22, 2003)

## SUBORDINATION, NON-DISTURBANCE
## AND ATTORNMENT AGREEMENT

THIS AGREEMENT, made as of the _6th_ day of _June_, 2003, between BANK OF AMERICA, N.A., a national banking association, as Administrative Agent for itself and the Lenders under the Loan Agreement defined below (hereinafter called "Lender") and TALULAH G, INC., a Nevada corporation hereinafter called "Tenant"), and ROUSE F.S., LLC, a Maryland limited liability company (hereinafter called "Landlord").

### W I T N E S S E T H:

WHEREAS, pursuant to that certain Loan Agreement for Construction and Development, dated as of July 9, 2001 (the "Loan Agreement"), Lender has made a loan to Landlord ("Borrower") (the "Loan") secured by (i) that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of July 9, 2001, recorded on July 12, 2001 in the Official Records of Clark County, Nevada ("Official Records") in Book 200100712, Instrument 00991, as amended from time to time (the "Mortgage") covering certain interests in land owned or leased by Landlord ("Mortgaged Property") and described on Exhibit "A" annexed hereto and made a part hereof, together with the improvements (to be) erected thereon, (ii) that certain Assignment of Rents and Leases, dated as of July 9, 2001, recorded on July 12, 2001 in the Official Record in Book 200100712, Instrument 00992, covering Landlord's interest in all leases, rents, profits and contracts for such property (the "Assignment of Leases"), and (iii) other documents executed in connection therewith; and

WHEREAS, Landlord and Tenant have entered into a lease dated _June 6_, _2003_, as amended by _N/A_ (hereinafter called the "Lease"), whereby Landlord leased certain premises to Tenant containing approximately _1,847_ square feet known as space no. _1145_ (the "Premises"); and

WHEREAS, Tenant has requested that Lender agree not to disturb Tenant's possessory rights in the Premises if Lender should foreclose its Mortgage provided that Tenant is not in default under the Lease and further provided that Tenant attorns to Lender or the purchaser at any foreclosure sale or to any party who takes a deed in lieu of foreclosure; and

WHEREAS, Lender is willing so to agree on the terms and conditions hereafter provided.

NOW, THEREFORE, in consideration of the mutual promises herein contained, to induce Lender to make the Loan and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord, Tenant and Lender covenant and agree as follows:

-1-

(May 22, 2003)

1.    The Lease and Tenant's leasehold estate created thereby, including all rights under the Lease, shall be and are completely and unconditionally subject and subordinate to the lien of the Mortgage and to all the terms, conditions and provisions thereof, to all advances made to or to be made thereunder, to any renewals, extensions, modifications or replacements thereof, and to any subsequent mortgage with which the Mortgage may be spread and/or consolidated.

2.    Tenant agrees that it will attorn to and recognize either the Lender or any purchaser at a foreclosure sale under the Mortgage, any person or entity who acquires the real property of which the Premises form a part by deed in lieu of foreclosure or otherwise, and the successors and assigns of such person or entity, as its Landlord for the unexpired balance (and any extensions, if exercised) of the term of the Lease upon the same terms and conditions set forth in the Lease.

3.    In the event that it should become necessary to foreclose the Mortgage, Lender will not disturb Tenant's possession under the Lease so long as tenant is not in default under any of the terms, covenants, or conditions of the Lease.

4.    In the event that Lender or any other party shall succeed to the interest of Landlord under the Lease, or otherwise becomes entitled to and takes possession of the Mortgaged Property, Lender, or any subsequent owner, shall not be:

A.    Liable for any act or omission of any prior landlord (including Landlord); or

B.    Liable for the return of any security deposit unless such security deposit has physically been received by Lender; or

C.    Subject to any offsets or defenses which Tenant might have against any prior landlord (including Landlord); or

D.    Bound by any rent or additional rent which Tenant might have paid for more than thirty (30) days in advance of the current month to any prior landlord (including Landlord); or

E.    Bound by any previous amendment, modification, financial settlement or termination of the Lease made without Lender's written consent; or

F.    To the extent applicable, obligated to reimburse Tenant for any costs which arise from the failure to have the Premises completed and ready for occupancy within the time requirements, if any, by the Lease; or

G.    Obligated or liable with respect to the construction and completion of any improvements for Tenant's use and occupancy.

5.    Tenant shall not pay any installment of rent or any part thereof more than thirty (30) days prior to the due date of such installment.

-2-

(May 22, 2003)

6.    Tenant agrees not to enter into any amendment, modification, termination or financial settlement to the Lease without first obtaining written consent thereto from Lender.    Any amendment, modification, termination or financial settlement to the Lease entered into without Lender's written consent shall be null and void.

7.    Tenant agrees to give Lender, by certified mail, return receipt requested or by nationally recognized overnight delivery service providing evidence of the date of delivery, with all charges prepaid, a copy of any notice of default served upon the Landlord within ten (10) days of delivery of such notice, provided that prior to such notice Tenant has been notified in writing (by way of Notice of Assignment of Rents and Leases or otherwise) of the address of such Lender.    This Agreement shall constitute notice to Tenant of Lender's address as set forth below.    Tenant further agrees that if Landlord shall have failed to cure such default within the time provided for in the Lease, then the Lender, if it elects to cure such default, shall have an additional thirty (30) days within which to cure such default or if such default cannot be cured within that time, then such additional time as may be necessary.    If within such thirty (30) days, Lender has commenced and is diligently pursuing the remedies necessary to cure such default (including but not limited to commencement of foreclosure proceedings, if necessary to effect such cure), the Lease shall not be terminated and shall remain in full force and effect while such remedies are being so diligently pursued.

8.    After notice is given to Tenant by Lender, pursuant to the Assignment of Leases, that the rentals under the Lease should be paid to Lender, Tenant shall pay to Lender, or in accordance with the directions of Lender, all rentals and other monies due and to become due to Landlord under the Lease, and Landlord hereby expressly authorizes Tenant to make such payments to Lender and hereby releases and discharges Tenant of and from any liability to Landlord on account of any such payments.

9.    This Agreement shall inure to the benefit of and shall be binding upon Tenant, Landlord and Lender, and their respective heirs, personal representatives, successors and assigns provided that, subject to the terms of the Lease, the interest of Tenant under this Agreement may not be transferred or assigned without Lender's written consent.    In the event any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or enforceability shall, at the option of Lender, not affect any other provisions of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

10.    No modification, amendment, waiver or release of any provision of this Agreement or any right, obligation, claim or cause of action arising thereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

11.    Where under this document rights and obligations are created between Tenant and Lender, at or subsequent to foreclosure proceedings, "Lender" shall be deemed to include any purchaser at a foreclosure sale or trustee's sale and any purchaser acquiring title through mortgage foreclosure proceedings.

-3-

(May 22, 2003)

12.    This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

13.    Tenant has not relied upon any representation (either oral or in writing) of Lender in executing the Lease or this Agreement and Tenant shall look only to Landlord to fulfill the terms, covenants and conditions of the Lease.

14.    Nothing contained in this Agreement shall in any way impair or affect the lien created by the Mortgage.

15.    This Agreement may be signed in several counterparts, each of which shall be deemed an original, and all such counterparts shall constitute one and the same instrument.  The signature of a party to any counterpart may be removed and attached to any other counterpart.  Any counterpart to which the signatures of all parties are attached shall constitute an original of this Agreement.

[Signature pages begin on following page]

-4-

(May 22, 2003)

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

LENDER:

Address:                                    BANK OF AMERICA, NA, individually and as
                                            Administrative Agent for the Lenders
231 South LaSalle Street,
12th Floor
Chicago, IL  60697                          By:_____
                                            Its:_____

THIS INSTRUMENT was acknowledged before me on _____, 200__ by _____ as _____ of BANK OF AMERICA, N.A.

_____
              Notary Public

[NOTARIAL SEAL]

My commission expires:_____

-5-

(May 22, 2003)

Address:

c/o The Howard Hughes Corporation
10000 West Charleston Boulevard
Las Vegas, NV  89135-1004

LANDLORD:

ROUSE F.S., LLC,
a   Maryland   limited   liability
company

By: _____

Its: _____ *Vice President*

THIS INSTRUMENT was acknowledged before me on *June 18* , 200 *3*
by *Andrew B. Bolton* , as Vice President of ROUSE F.S., LLC.

_____
Notary Public

[NOTARIAL SEAL]

My commission expires: *8/9/2005*

-7-

(May 22, 2003)

EXHIBIT A
MORTGAGED PROPERTY

PARCEL NO. I:

Fee Simple as to Lots One (1) through Seven (7) of the FASHION SHOW, as shown by map thereof on file in Book 26 of Plats, page 80, in the Office of the County Recorder of Clark County, Nevada.  EXCEPTING THEREFROM all improvements, structures and fixtures situated on Lots 1-6 inclusive.

PARCEL NO. II:

Fee Simple, as to an undivided 35.7629% interest in and to all improvements, structures and fixtures, situated on Lot 1 of the FASHION SHOW, as shown by map thereof on file in Book 26 of Plats, page 80, in the Office of the County Recorder of Clark County, Nevada.

PARCEL NO. III:

The reversionary interests under (i) the instruments referred to in those certain Memorandums of Leases recorded February 9, 1981 in Book 1353 as Document No. 1312435, 1312436, 1312437, 1312438 and 1312439, in the improvements, structures and fixtures, situated on Lots 2 through 6, inclusive, of THE FASHION SHOW, as shown by map thereof on file in Book 26 of Plats, page 80, in the Office of the County Recorder of Clark County, Nevada, and (ii) the instruments referred to in those certain Grant, Bargain, Sale Deeds recorded February 9, 1981 in Book 1353 as Document No. 1312443, 1312444, 1312445, 1312446 and 1312447, in a 64.2371% undivided interest in the improvements, structures and fixtures, situated on Lot 1 of THE FASHION SHOW, as shown by map thereof on file in Book 26 of Plats, page 80, in the Office of the County Recorder of Clark County, Nevada.

PARCEL IV:

A non-exclusive easement for ingress and egress, for the passage of vehicles and the accommodation of pedestrians thereto on, over, through and across the private streets known as Dio Drive, Fashion Show Drive and the public street known as Industrial Road, upon the terms, covenants and conditions contained in that certain instrument entitled "Easement Agreement", executed by and between Summa Corporation, a Delaware Corporation and H-S Las Vegas Associates, a Nevada General Partnership, recorded February 4, 1981 in Book 1351 as Document No. 1310781, Official Records.

PARCEL V:

(May 22, 2003)

Non-exclusive easements for ingress and egress; automobile parking; pedestrian uses; installation, operation and maintenance of separate and common utility lines; structural support; truck ramps, truck parking and truck turnaround areas; and other uses, all as more particularly defined and described in that certain document entitled "Construction, Operation and Reciprocal Easement Agreement" dated as February 9, 1981 executed by and between H-S Las Vegas Associates, a general partnership comprised of Summa Corporation, a Delaware Corporation and Ernest W. Hahn, Inc., a California Corporation; Carter Hawley Hale Stores, Inc., a California Corporation; Dayton Hudson Corporation, a Minnesota Corporation; Beverly Properties, Inc., a California Corporation; Federated Department Stores, Inc., a Delaware Corporation, and Adcor Realty Corporation, a New York Corporation, together with the joinder therein and execution thereof by Saks & Company, a New York Corporation, and Associated Dry Goods Corporation, a Virginia Corporation; and consented to and approved by (to the extent as more fully described therein) Summa Corporation, a Delaware Corporation, in, upon and all the terms, covenants, conditions, provisions, reservations, limitations, duties, obligations, liens, assessments and easements as more fully described and set forth in said Agreement, recorded February 9, 1981, in Book 1353 as Document No. 1312440, and as amended by Amendment No. 1 to Construction, Operation and Reciprocal Easement Agreement recorded November 12, 1981 in Book 1486 as Document No. 1445013.

PARCELS I THROUGH V ALL LIE WITHIN LOT ONE (1) OF FASHION SHOW 2000, A COMMERCIAL SUBDIVISION, AS SHOWN BY MAP THEREOF ON FILE IN BOOK 95 OF PLATS, PAGE 48, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

PARCEL VI:

LOT ONE (1) OF FASHION SHOW 2000, A COMMERCIAL SUBDIVISION, AS SHOWN BY MAP THEREOF ON FILE IN BOOK 95 OF PLATS, PAGE 48, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

EXCEPTING THEREFROM THAT PORTION OF SAID LOT ONE (1), AS CONVEYED TO CLARK COUNTY BY DEED RECORDED MAY 24, 2001, IN BOOK 20010524 AS INSTRUMENT NUMBER 01103, OFFICIAL RECORDS.

FURTHER EXCEPTING THEREFROM THAT PORTION OF SAID LOT ONE (1), AS CONVEYED TO CLARK COUNTY BY DEED RECORDED MAY 24, 2001, IN BOOK 20010524, AS INSTRUMENT NUMBER 01105, OFFICIAL RECORDS.

# EXHIBIT  B

# EXHIBIT  B

(May 22, 2003)

<u>G U A R A N T Y</u>

ANNEXED TO AND FORMING A PART OF THE LEASE DATED    JUN 0 6 2003

BETWEEN, ROUSE F.S., LLC, a Maryland  limited liability company ("Landlord"), and TALULAH G, INC., a Nevada corporation t/a TALULAH G ("Tenant").

The undersigned, JOSHUA GRANTZ and MEITAL GRANTZ ("Guarantor"), whose address is 2951 De Silva Drive, Las Vegas, Nevada, 89121, in consideration of the leasing of the Premises described in the annexed Lease to the above named Tenant, does hereby covenant and agree:

A.    That if Tenant shall default in the performance of any of the covenants and obligations of said Lease on Tenant's part to be performed, then Guarantor will on demand well and truly perform the covenants and obligations of said Lease on Tenant's part to be performed and will on demand pay to Landlord any and all sums due to Landlord, including all damages and expenses that may arise in consequence of Tenant's default, and Guarantor does hereby waive all requirements of notice of the acceptance of this Guaranty and all requirements of notice of breach or non-performance by Tenant.

B.    That Guarantor may, at Landlord's option, be joined in any action or proceeding commenced by Landlord against Tenant in connection with and based upon any covenants and obligations in said Lease, and Guarantor waives any demand by Landlord and/or prior action by Landlord of any nature whatsoever against Tenant.

C.    That this Guaranty shall remain and continue in full force and effect as to any renewal, extension, modification or amendment of said Lease and as to any assignee of Tenant's interest in said Lease, and Guarantor waives notice of any and all such renewals, extensions, modifications, amendments or assignments.

D.    That Guarantor's obligations hereunder shall remain fully binding although Landlord may have waived one or more defaults by Tenant, extended the time of performance by Tenant, released, returned or misapplied other collateral given later as additional security (including other guaranties) or released Tenant from the performance of its obligations under such Lease.

E.    That this Guaranty shall remain in full force and effect notwithstanding the institution by or against Tenant of bankruptcy, reorganization, readjustment, receivership or insolvency proceedings of any nature, or the disaffirmance of said Lease in any such proceedings or otherwise.

-1-

(May 22, 2003)

F.   That if this Guaranty is signed by more than one party, their
     obligations shall be joint and several and the release of one of
     such Guarantors shall not release any other of such Guarantors.

G.   That the Guarantor or Guarantors hereby waive all suretyship
     defenses generally, and the right to petition for the marshalling
     of assets.

H.   That this Guaranty shall be applicable to and inure to the benefit
     of Landlord, its successors and assigns and shall be binding upon
     the heirs, representatives, successors and assigns of Guarantor.

I.   That Guarantor hereby waives any and all rights which it may have
     to request a jury trial in any action or proceeding, at law or in
     equity, on any and every matter arising out of or relating in any
     way to this Guaranty and the Lease.

     IN WITNESS WHEREOF, the undersigned has executed this Guaranty this
     day of    JUN 0 6 2003          ,       .

WITNESS:                              JOSHUA GRANTZ, Guarantor

_____              _____

WITNESS:                              MEITAL GRANTZ, Guarantor

_____              _____

- 2 -

# EXHIBIT  C

# EXHIBIT  C

Electronically Filed
01/25/2013 10:29:55 AM

**CLERK OF THE COURT**

1  **COMP**
JAMES E. SMYTH II
2  Nevada Bar No. 6506
ANTHONY J. CELESTE
3  Nevada Bar No. 8776
KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO
4  8345 West Sunset Road, Suite 250
Las Vegas, Nevada 89113
5  Telephone:  (702) 792-7000
Fax:          (702) 796-7181
6  jsmyth@kcnvlaw.com
aceleste@kcnvlaw.com
7
Attorneys for Plaintiff
8

9                         DISTRICT COURT

10                  CLARK COUNTY, NEVADA

11  FASHION SHOW MALL LLC, a Delaware   Case No. A-13-675643-C
limited liability company,            Dept. No. XXX
12
                     Plaintiff,        **COMPLAINT**
13  vs.
                                       **(Arbitration Exemption Requested:**
14  TALULAH G, INC., a Nevada corporation   **Damages in Excess of $50,000.00)**
d/b/a TALULAH G; JOSHUA GRANTZ, an
15  individual; MEITAL GRANTZ, an individual;
DOES I through X, inclusive; and ROE
16  BUSINESS ENTITIES I through X, inclusive;

17                     Defendants.

18

19          Plaintiff FASHION SHOW MALL LLC, a Delaware limited liability company, by and

20  through its attorneys, Kaempfer Crowell Renshaw Gronauer & Fiorentino, for its Complaint

21  against the above-named Defendants, TALULAH G, INC, a Nevada corporation d/b/a

22  TALULAH G, JOSHUA GRANTZ, an individual, and MEITAL GRANTZ, an individual,

23  alleges as follows:

24

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 W. Sunset Rd.
Suite 250
Las Vegas, Nevada 89113

1212174_1  11453.228                                    Page 1 of 9

## PARTIES

1.      Plaintiff, FASHION SHOW MALL LLC, ("**Landlord**" or "**Plaintiff**") is now, and at all times relevant herein was, a Delaware limited liability company duly authorized to conduct business in the State of Nevada, is and was the successor in interest to Rouse F.S., LLC, a Maryland limited liability company, and owns and operates the Fashion Show Mall property located at 3200 Las Vegas Boulevard South, Las Vegas, Nevada 89109 ("**Property**").

2.      Upon information and belief, Defendant TALULAH G, INC, a Nevada corporation d/b/a TALULAH G ("**Tenant**") is now and, at all times relevant herein, was a Nevada corporation doing business in Clark County, Nevada.

3.      Upon information and belief, Defendant JOSHUA GRANTZ, an individual ("**J. Grantz**" or "**Guarantor**"), is now and, at all times relevant herein, was an individual residing in Clark County, Nevada.

4.      Upon information and belief, Defendant MEITAL GRANTZ, an individual ("**M. Grantz**" or "**Guarantor**") (J. Grantz and M. Grantz are collectively referred to hereinafter as "Guarantors"), is now and, at all times relevant herein, was an individual residing in Clark County, Nevada.

5.      The true names and capacities, whether individual, corporate, associate or otherwise, of Defendant DOES I through X, inclusive, are unknown to Plaintiff who therefore sues said Defendants by such fictitious names.   Upon information and belief, each of the Defendants sued herein as DOE has some responsibility for the damages to Plaintiff as a result of the matters alleged below and Plaintiff will seek leave of the Court to amend this Complaint to show their true names or capacities upon ascertaining same.

6.      Defendant ROE BUSINESS ENTITIES I through X, inclusive, are sued herein under fictitious names.   Their true names and capacities are unknown to Plaintiff.   Plaintiff

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 W. Sunset Rd.
Suite 250
Las Vegas, Nevada 89113

1212174_1  11453.228

Page 2 of 9

1  believes that each Defendant named as a ROE is responsible in some manner for the events

2  alleged herein and caused damage to Plaintiff.   When their true names and capacities are

3  ascertained, Plaintiff will amend this Complaint by inserting their true names and capacities

4  herein.

5  <u>**GENERAL ALLEGATIONS**</u>

6       7.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1

7  through 6 inclusive, and incorporates the same as though fully set forth herein.

8       8.     On or about June 6, 2003, Landlord and Tenant entered into that Certain Lease

9  Agreement ("**Lease Agreement**"), wherein Tenant agreed to lease from Landlord a portion of

10  the Property, commonly known as space 1145 ("**Leased Premises**").

11       9.     On or about February 24, 2005, Landlord and Tenant entered into that certain

12  First Amendment to Lease ("**Amendment**" and together with the Lease Agreement, collectively,

13  the "**Lease**"), wherein Landlord and Tenant agreed, among other things, to certain terms

14  regarding rental issues.

15       10.    The outside commencement date for the Lease was October 1, 2003

16  ("**Commencement Date**") for term terminating on September 30, 2013 ("**Term**").

17       11.    During the Term, Tenant agreed to pay annual basic rent, annual percentage

18  rental, additional rental, other costs and charges in the amounts and in the manner set forth in the

19  Lease Agreement.

20       12.    In connection with the Lease, on approximately June 6, 2003, the Guarantors

21  (together with the Tenant, collectively, the "**Defendants**") executed that certain Guaranty

22  ("**Guaranty**"), wherein the Guarantor absolutely and unconditionally guaranteed the payment

23  and performance of the Tenant under the Lease.

24

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 W. Sunset Rd.
Suite 250
Las Vegas, Nevada 89113

1212174_1  11453.228

Page 3 of 9

13.    The Defendants have failed to pay all or a portion of the Minimum Rent, Additional Rent and/or other amounts due under the Lease.

14.    On or about December 28, 2012, Plaintiff sent to Defendants via certified mail, return receipt requested, a Notice of Default for the then past-due balance of $70,494.20.

15.    Defendants failed and refused to cure the default.

16.    On or about January 12, 2013, a written Notice to Tenant of Lockout of Commercial Premises ("**Lockout Notice**") was posted on the front door of the Leased Premises and was served in accordance with NRS 118C.200, reflecting a then due delinquency of rent in the amount of $87,527.37.

17.    Since Defendants failed to cure the default reflected in the Lockout Notice, on or about January 22, 2013, Plaintiff lawfully took back possession of the Leased Premises.

18.    Notwithstanding the posting and service of the Lockout Notice, Defendants have failed to cure the default and pay the amounts required under the Lease Agreement.

19.    As of January 12, 2013, Defendants owed Landlord $87,527.37 in rent and other charges, which amount continues to accrue with interest and charges.

20.    Defendants have monthly obligations to the Plaintiff under the terms of the Lease Agreement, including, but not limited to, rental payments, percentage rent, common area maintenance fees, taxes, utilities, and reimbursements.

21.    Pursuant to the terms of the Lease Agreement, as a result of the default, Plaintiff is entitled to the accelerated amount of all rent and other charges owing during the remaining portion of the Term and to the costs incurred in reletting the Leased Premises, including attorney's fees, repairs, brokerage fees, renovation or alteration of the Leased Premises to make it suitable for a replacement tenant.

/ / / /

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 W. Sunset Rd.
Suite 250
Las Vegas, Nevada 89113

1212174_1  11453.228

Page 4 of 9

## FIRST CLAIM FOR RELIEF

### (Breach of Contract against Tenant on Lease Agreement)

22.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 21 inclusive, and incorporates the same as though fully set forth herein.

23.     The Lease is valid and binding contracts between Plaintiff and Defendants.

24.     Plaintiff performed its obligations owed under the Lease by making the Leased Premises available to Tenant.

25.     Contrary to the terms of the Lease, Defendants failed to tender payment of all amounts due under the Lease.

26.     Plaintiff has demanded payment from Defendants.

27.     Tenant was lawfully locked out of the Leased Premises on or about January 12, 2013.

28.     Defendants' refusal to tender the amounts due and owing under the Lease Agreement constitutes a breach of the express terms of the Lease Agreement.

29.     As a direct and proximate result of Defendants' breach of the Lease Agreement, Plaintiff has suffered damages in an amount in excess of $10,000.00.

30.     As a direct and proximate result of Defendants' breach of the Lease Agreement, Plaintiff continues to be damaged in an amount in excess of $10,000.00.

31.     Plaintiff has been required to retain the services of Kaempfer Crowell Renshaw Gronauer & Fiorentino to prosecute this action, and therefore is contractually entitled to recover an award of reasonable attorneys' fees and costs of suit incurred herein, as expressly provided in the Lease.

/ / / /

/ / / /

Kaempfer Crowell Renshaw
Gronauer & Fiorentino
8345 W. Sunset Rd.
Suite 250
Las Vegas, Nevada 89113

1212174_1  11453.228

Page 5 of 9

1

## SECOND CLAIM FOR RELIEF

2

### (Unjust Enrichment)

3     32.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1

4     through 31 inclusive, and incorporates the same as through fully set forth herein.

5     33.     Plaintiff provided Tenant with the Leased Premises pursuant to the Lease.

6     34.     Tenant used the Leased Premises provided by Plaintiff.

7     35.     Defendants failed to pay Plaintiff for the Premises provided by Plaintiff.

8     36.     Defendants will be unjustly enriched in an amount in excess of $10,000.00 if

9     permitted to retain the reasonable value of the use of the Leased Premises without paying

10    Plaintiff for the same.

11    37.     Plaintiff has been required to retain the services of Kaempfer Crowell Renshaw

12    Gronauer & Fiorentino to prosecute this action, and therefore is contractually entitled to recover

13    an award of reasonable attorneys' fees and costs of suit incurred herein.

14

## THIRD CLAIM FOR RELIEF

15

### (Breach of Contract against Guarantors - Guaranty)

16    38.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1

17    through 37, inclusive, and incorporates the same as through fully set forth herein.

18    39.     The Guarantors executed the Guaranty, which is a valid and enforceable contract.

19    40.     Plaintiff provided the Leased Premises to Tenant pursuant to the Lease as

20    contemplated by the Guaranty.

21    41.     Contrary to the terms of the Guaranty, the Guarantors have failed to absolutely

22    and unconditionally guaranty the payment and performance of Tenant under the Lease

23    Agreement.

24

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 W. Sunset Rd.
Suite 250
Las Vegas, Nevada 89113

1212174_1  11453.228

Page 6 of 9

42.     Contrary to the terms of the Guaranty, Guarantors failed to pay the $87,527.37 due and owing as of January 12, 2013.

43.     Plaintiff has demanded payment from the Guarantors.

44.     The Guarantors' refusal to tender the amounts due and owing under the Lease as absolutely and unconditionally guaranteed under the Guaranty constitutes a breach of the express terms of the Guaranty.

45.     As a direct and proximate result of Guarantors' breach of the Guaranty, Plaintiff has been damaged in an amount in excess of Ten Thousand Dollars ($10,000.00) and such amount shall be proven at trial.

46.     Plaintiff has been required to retain the services of Kaempfer Crowell Renshaw Gronauer & Fiorentino to prosecute this action, and therefore is entitled to recover an award of reasonable attorneys' fees and costs of suit incurred herein, as expressly provided in the Guaranty.

## FOURTH CLAIM FOR RELIEF

### (Monies Due and Owing)

47.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 46 inclusive, and incorporates the same as though fully set forth herein.

48.     Plaintiff is entitled to recovery of monies due for rent, charges, fees and interest under the Lease and Guaranty.

49.     Defendants have failed and refused to pay Plaintiff for the foregoing sums, and said sums are now past due and owing to Plaintiff.

50.     As a direct result of said actions, Plaintiff has been damaged and injured in an amount in excess of $10,000.00.

////

Kaempfer Crowell Renshaw
Gronauer & Fiorentino
8345 W. Sunset Rd.
Suite 250
Las Vegas, Nevada 89113

1212174_1  11453.228

Page 7 of 9

1    51.    As a direct and proximate result of Defendants' actions, Plaintiff will continue to

2    be damaged in an amount in excess of $10,000.00.

3    52.    Plaintiff is entitled to pre-judgment and post-judgment interest on the sums due,

4    in accordance with the Lease, Guaranty, and/or applicable statute.

5    53.    Plaintiff has been required to retain the services of Kaempfer Crowell Renshaw

6    Gronauer & Fiorentino to prosecute this action, and therefore is legally and contractually entitled

7    to recover an award of reasonable attorneys' fees and costs of suit incurred herein.

8    WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

9    1.    On the First Claim for Relief:

10    (a)    For judgment against Defendants in an amount in excess of $10,000.00,

11    which amount shall be proven at trial.

12    (b)    For an award of pre-judgment and post-judgment interest on all amounts

13    due and owing to Plaintiff.

14    (c)    For attorney's fees and costs.

15    2.    On the Second Claim for Relief:

16    (a)    For judgment against Defendants in an amount in excess of $10,000.00,

17    which amount shall be proven at trial.

18    (b)    For an award of pre-judgment and post-judgment interest on all amounts

19    due and owing to Plaintiff.

20    (c)    For attorney's fees and costs.

21    3.    On the Third Claim for Relief:

22    (a)    For judgment against Guarantors in an amount in excess of $10,000.00,

23    which amount shall be proven at trial.

24

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 W. Sunset Rd.
Suite 250
Las Vegas, Nevada 89113

1212174_1  11453.228

Page 8 of 9

1        (b)     For an award of pre-judgment and post-judgment interest on all amounts

2                 due and owing to Plaintiff.

3        (c)     For attorney's fees and costs.

4    4.    On the Fourth Claim for Relief:

5        (a)     For judgment against Defendants in an amount in excess of $10,000.00,

6                 which amount shall be proven at trial.

7        (b)     For an award of pre-judgment and post-judgment interest on all amounts

8                 due and owing to Plaintiff.

9        (c)     For attorney's fees and costs.

10

11    DATED this 25th day of January, 2013.

12                        KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

13

14                       BY:

15                        JAMES E. SMYTH II (Nevada Bar No. 6506)
                              ANTHONY J. CELESTE (Nevada Bar No. 8776)

16                        8345 West Sunset Road, Suite 250
                              Las Vegas, Nevada 89113

17                        **Attorneys for Plaintiff**

18

19

20

21

22

23

24

Kaempfer Crowell Renshaw
Gronauer & Fiorentino
8345 W. Sunset Rd.
Suite 250
Las Vegas, Nevada 89113

1212174_1  11453.228

# EXHIBIT  D

# EXHIBIT  D

**Bryan Viellion**

| | |
|---|---|
| **From:** | Joshua Grantz <joshuagrantz@gmail.com> |
| **Sent:** | Monday, February 3, 2014 9:03 AM |
| **To:** | Jim Smyth |
| **Cc:** | Karen Shuman; Catherine Ricci |
| **Subject:** | Re: Talulah G space Fashion Show Mall |

Jim,

If it is not on the list in the bankruptcy then it is an oversight by the court and one that will be rectified. In fact, at the time last year, I asked that you follow up with the bankruptcy lawyer, Steve Szostek. Did you do that? All landlords were listed in the BK. I have not had anything to do with the store since 2007, filed personal bk in 2008, and had no idea what was going on with the store since then.

I received no follow up regarding this matter as I would have shut it down immediately if I had.

I would like this resolved ASAP.

-Joshua

On Mon, Feb 3, 2014 at 8:33 AM, Jim Smyth <JSmyth@kcnvlaw.com> wrote:

Mr. Grantz,


My recollection and our records differ from your recollection. You did not resolve this issue. We communicated with you and asked you to provide documentation supporting your claim that Fashion Show was listed as a creditor in your bankruptcy. You never did provide any such documentation so we went and looked ourselves and Fashion Show was not listed as a creditor in your bankruptcy. We even emailed a copy of the complaint to you and you never responded. Attached is a copy of the list of creditors in your bankruptcy and Fashion Show is not listed. Let me know if I'm missing anything. Thanks,

Jim



James E. Smyth II

1

Kaempfer Crowell

8345 West Sunset Road, Suite 250

Las Vegas, NV 89113
Tel:  (702) 792-7000
Fax:  (702) 796-7181
Email: jsmyth@kcnvlaw.com


| BIO  | WEBSITE  | VCARD |



 Please consider the environment before printing this email

This e-mail communication is a confidential attorney-client communication intended only for the person named above.  If you are not the person named above, or the employee or agent responsible for delivery of the following information, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone (702) 792-7000.  Also, please e-mail the sender that you have received the communication in error.  We will gladly reimburse your telephone expenses.  Thank you.

IRS Circular 230 Notice:  To ensure compliance with requirements imposed by the IRS, we inform you that any federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Joshua Grantz [mailto:joshuagrantz@gmail.com]
**Sent:** Friday, January 31, 2014 4:07 PM
**To:** Jim Smyth
**Subject:** Re: Talulah G space Fashion Show Mall


Jim,



I thought this issue was resolved but I just saw a listing on my credit report for this claim. As we discussed, I filed bankruptcy in 2008 and your client was a creditor. This needs to be removed ASAP. I have not received any communication from your office or my attorney regarding this issue in eleven months.


-Joshua Grantz

415-850-4180

On Tue, Feb 5, 2013 at 10:02 AM, Jim Smyth <JSmyth@kcnvlaw.com> wrote:

Per your request, a copy of the complaint is attached.



James E. Smyth II

Kaempfer Crowell Renshaw Gronauer & Fiorentino

8345 West Sunset Road, Suite 250

Las Vegas, NV 89113
Tel:  (702) 792-7000
Fax:  (702) 796-7181
Email: jsmyth@kcnvlaw.com

| BIO | WEBSITE | VCARD |

 **Please consider the environment before printing this email**

This e-mail communication is a confidential attorney-client communication intended only for the person named above.  If you are not the person named above, or the employee or agent responsible for delivery of the following information, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone (702) 792-7000.  Also, please e-mail the sender that you have received the communication in error.  We will gladly reimburse your telephone expenses.  Thank you.

IRS Circular 230 Notice:  To ensure compliance with requirements imposed by the IRS, we inform you that any federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Joshua Grantz [mailto:joshuagrantz@gmail.com]
**Sent:** Tuesday, February 05, 2013 9:53 AM


**To:** Jim Smyth; meitalbronstein@thebungalowlv.com
**Cc:** Catherine Sutton; Tony Celeste; Karen Shuman
**Subject:** RE: Talulah G space Fashion Show Mall


Also, I have not seen any documentation on this case. So please email to me ASAP.

**From:** Jim Smyth [mailto:JSmyth@kcnvlaw.com]
**Sent:** Tuesday, February 05, 2013 9:25 AM
**To:** Joshua Grantz; meitalbronstein@thebungalowlv.com
**Cc:** Catherine Sutton; Tony Celeste; Karen Shuman
**Subject:** RE: Talulah G space Fashion Show Mall

Mr. Grantz,

Thank you for the letter but it has nothing to do with this matter. If you have documentation of a bankruptcy discharging this obligation (which I doubt you have), please fax it to me. As for your divorce, it would not end your obligation on the guaranty nor would any agreement entered with any other operators of the store. If you have contrary documentation, please provide it.

As for your question about Chris Kaempfer, he is the same Kaempfer that was a partner at Kummer Kaempfer but that does not give rise to a conflict of interest that would preclude us from our current representation. Even if we were conflicted out (which we are not), it would not change your obligations under the guaranty.

Should you decide that you would like to try to negotiate a settlement with GGP, please let me know your offer and I will take it back to GGP. Thank you,

Jim



James E. Smyth II

Kaempfer Crowell Renshaw Gronauer & Fiorentino

8345 West Sunset Road, Suite 250

Las Vegas, NV 89113
Tel:  (702) 792-7000
Fax:  (702) 796-7181
Email: jsmyth@kcnvlaw.com

4

| BIO  |  WEBSITE  |  VCARD  |

 **Please consider the environment before printing this email**

This e-mail communication is a confidential attorney-client communication intended only for the person named above.  If you are not the person named above, or the employee or agent responsible for delivery of the following information, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone (702) 792-7000.  Also, please e-mail the sender that you have received the communication in error.  We will gladly reimburse your telephone expenses.  Thank you.

IRS Circular 230 Notice:  To ensure compliance with requirements imposed by the IRS, we inform you that any federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Joshua Grantz [mailto:joshuagrantz@gmail.com]
**Sent:** Monday, February 04, 2013 5:42 PM
**To:** Jim Smyth; meitalbronstein@thebungalowlv.com
**Cc:** Catherine Sutton; Tony Celeste; Karen Shuman
**Subject:** RE: Talulah G space Fashion Show Mall


Jim,


This is the letter sent to Irvine Company. The case there was also regarding a broken lease and personal guarantee. Please let me know if I need to have this letter re-written for your purposes. I was incorrect on the date of the BK, as it was ultimately discharged in 2/10. I have had no involvement in Talulah G since 2007, my divorce from Meital was completed in 2008, and that same year another company took over the store and started paying the rent at Fashion Show Mall.


Also, is the partner Kaempfer of the firm formerly KKBR? I am not sure about the rules regarding this, but KKBR has represented me and my interests several times going back as far as 1999 when he helped me form a software company in Henderson. I also met/retained him regarding Talulah G, and when I was helping build companies for both Jonathan Fine and Jim Rhodes.  I have had personal meetings with Mr. Kaempfer.


Thank you,


-Joshua

**From:** Jim Smyth [mailto:JSmyth@kcnvlaw.com]
**Sent:** Monday, February 04, 2013 4:27 PM
**To:** Joshua Grantz; meitalbronstein@thebungalowlv.com
**Cc:** Catherine Sutton; Tony Celeste; Karen Shuman
**Subject:** RE: Talulah G space Fashion Show Mall

Please note that this a current existing lease and all the rental was well after 2008. Therefore, I doubt that you have any documentation that would result in this case being dismissed without payment. With that said, if you believe you have documents discharging this obligation, fax me whatever bankruptcy documents that you have that you claim establish this obligation is discharged. I don't understand your reference to a company in California.



James E. Smyth II

Kaempfer Crowell Renshaw Gronauer & Fiorentino

8345 West Sunset Road, Suite 250

Las Vegas, NV 89113
Tel: (702) 792-7000
Fax: (702) 796-7181
Email: jsmyth@kcnvlaw.com

| BIO | WEBSITE | VCARD |

 Please consider the environment before printing this email

This e-mail communication is a confidential attorney-client communication intended only for the person named above. If you are not the person named above, or the employee or agent responsible for delivery of the following information, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone (702) 792-7000. Also, please e-mail the sender that you have received the communication in error. We will gladly reimburse your telephone expenses. Thank you.

IRS Circular 230 Notice: To ensure compliance with requirements imposed by the IRS, we inform you that any federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Joshua Grantz [mailto:joshuagrantz@gmail.com]
**Sent:** Monday, February 04, 2013 4:19 PM
**To:** Jim Smyth; meitalbronstein@thebungalowlv.com
**Cc:** Catherine Sutton; Tony Celeste; Karen Shuman
**Subject:** RE: Talulah G space Fashion Show Mall

Jim,

My bankruptcy was discharged in 2008 in Las Vegas, NV. Fashion Show Mall and GGP were in the list of creditors.

Meital and I have been down this road before. The Irvine Company in Newport Beach, CA also tried to sue us. In their case it was for $1.6mil. It too was thrown out due to the discharged bankruptcy.

This is not something we take lightly. Unfortunately, those businesses did not work out. It certainly cost our landlords financially with regard to lost rent, but it cost Meital and I our business, our home, and our livelihood.

What do you need from us to have this dismissed ASAP. I do not want creditors harassing my family.

-Joshua

**From:** Jim Smyth [mailto:JSmyth@kcnvlaw.com]
**Sent:** Monday, February 04, 2013 4:13 PM
**To:** meitalbronstein@thebungalowlv.com
**Cc:** Joshua Grantz; Catherine Sutton; Tony Celeste; Karen Shuman
**Subject:** RE: Talulah G space Fashion Show Mall

Hello Ms. Bronstein,

Thank you for taking time to email me.  Please remember, however, that we are counsel for GGP so we have no discretion regarding whether to pursue the claims on the lease and the guaranties.  We were tasked with filing an action for damages against you and Mr. Grantz since you are both personal guarantors on the lease.  From your email, I understand neither you nor your husband have a current bankruptcy pending therefore the obligations on the guaranties have not been discharged.  We appreciate your difficulties but we, as counsel for GGP, are not authorized to waive or release you from your obligations but should you decide that you would like to try to negotiate a settlement with our client (for example, a payment plan), please let us know your offer and we will take it back to GGP.  Thank you,

Jim



James E. Smyth II

Kaempfer Crowell Renshaw Gronauer & Fiorentino

8345 West Sunset Road, Suite 250

Las Vegas, NV 89113
Tel:  (702) 792-7000
Fax:  (702) 796-7181
Email: jsmyth@kcnvlaw.com

| BIO  | WEBSITE  | VCARD |

 Please consider the environment before printing this email

This e-mail communication is a confidential attorney-client communication intended only for the person named above.  If you are not the person named above, or the employee or agent responsible for delivery of the following information, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone (702) 792-7000.  Also, please e-mail the sender that you have received the communication in error.  We will gladly reimburse your telephone expenses.  Thank you.

IRS Circular 230 Notice:  To ensure compliance with requirements imposed by the IRS, we inform you that any federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Meital Bronstein [mailto:meitalbronstein@gmail.com]
**Sent:** Friday, February 01, 2013 11:23 AM
**To:** Jim Smyth
**Cc:** Joshua Grantz
**Subject:** Talulah G space Fashion Show Mall


Dear Mr. Smyth,


I realize the tenant who was paying GGP rent for the past 4.5 years has abandoned the property and has not paid rent in over 5 months.  Unfortunately, my ex husband and I (Joshua Grantz) have both filed bankruptcy over 3 years ago and have no assets or cash to reimburse the mall.  This tenant had taken over the space years ago and intended on staying there through the end of the lease.  Unfortunately, they have put us all in a bad position however, there is nothing I can do.  I don't own a home or any assets of value and neither does my ex.  I cannot afford an attorney to represent me with any legal action you are planning against me.  It would be best if you have your next tenant move in quicker.  In addition, GGP had originally relocated our store to this unit with

promises of designer retailers on that end of the mall. All we got was Forever 21 and Top Shop and Ed Hardy. GGP has done significant damage to our business from inception with false promises causing us to BK.


Sincerely,

Meital Bronstein




--
Joshua M. Grantz
Grantz Industries

joshuagrantz@gmail.com
Cell:    (415) 850-4180




--
Joshua M. Grantz
Grantz Industries

joshuagrantz@gmail.com
Cell:    (415) 850-4180

# EXHIBIT  E

# EXHIBIT  E

**RECORDING COVER PAGE**
(Must be typed or printed clearly in BLACK ink only
and avoid printing in the 1" margins of document)

④

Inst #: 201310290003165
Fees: $20.00
N/C Fee: $0.00
10/29/2013 03:00:02 PM
Receipt #: 1825494
Requestor:
**FIRST LEGAL INVESTIGATIONS**
Recorded By: BGN   Pgs: 4
**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

APN# _____

_____

(11 digit Assessor's Parcel Number may be obtained at:
http://redrock.co.clark.nv.us/assrrealprop/ownr.aspx)

## TITLE OF DOCUMENT
**(DO NOT Abbreviate)**

Default Judgment Against Talulah G. Inc., a Nevada

corporation, d/b/a Talulah G; Joshua Grantz, an individual;

and Meital Grantz, an individual

**Document Title on cover page must appear EXACTLY as the first page of the
document to be recorded.**

**RECORDING REQUESTED BY:**
James E. Smyth II

_____

**RETURN TO: Name** Kaempfer Crowell

**Address** 8345 W. Sunset Rd., Ste. 250

**City/State/Zip** Las Vegas, NV 89113

**MAIL TAX STATEMENT TO: (Applicable to documents transferring real property)**

**Name**_____

**Address**_____

**City/State/Zip**_____

This page provides additional information required by NRS 111.312 Sections 1-2.
An additional recording fee of $1.00 will apply.
To print this document properly—do not use page scaling.

Electronically Filed
10/24/2013 05:53:34 PM

CLERK OF THE COURT

1   JAMES E. SMYTH II
    Nevada Bar No. 6506
2   ANTHONY J. CELESTE
    Nevada Bar No. 8776
3   KAEMPFER CROWELL
    8345 West Sunset Road, Suite 250
4   Las Vegas, Nevada 89113
    Telephone:  (702) 792-7000
5   Fax:        (702) 796-7181
    jsmyth@kcnvlaw.com
6   aceleste@kcnvlaw.com

7   Attorneys for Plaintiff

8

9                          DISTRICT COURT

10                     CLARK COUNTY, NEVADA

11   FASHION SHOW MALL LLC, a Delaware       Case No.   A-13-675643-C
     limited liability company,              Dept. No.  XXX

12                Plaintiff,

13   vs.

14   TALULAH G, INC., a Nevada corporation       **DEFAULT JUDGMENT AGAINST**
     d/b/a TALULAH G; JOSHUA GRANTZ, an      **TALULAH G. INC., a Nevada corporation,**
15   individual; MEITAL GRANTZ, an individual;   **d/b/a TALULAH G; JOSHUA GRANTZ,**
     DOES I through X, inclusive; and ROE         **an individual; and MEITAL GRANTZ, an**
16   BUSINESS ENTITIES I through X, inclusive;              **individual**

17                Defendants.

18

19        An Application having been made by Plaintiff FASHION SHOW MALL, LLC, a

20   Delaware limited liability company ("Plaintiff"), for default judgment against Defendants

21   TALULAH G, INC., a Nevada corporation d/b/a TALULAH G ("Talulah G"); JOSHUA

22   GRANTZ, an individual ("Joshua"); and MEITAL GRANTZ, an individual ("Meital") (Talulah

23   G, Joshua and Meital are collectively referred to as the "Defendants"), and the Default of

24   Defendants having been entered for failure to answer or otherwise defend as to Plaintiff's

KAEMPFER CROWELL
8345 W Sunset Rd.
Suite 250
Las Vegas, Nevada  89113

1315046_1.DOCX  11453.228

Page 1 of 3

1    Complaint, and it appearing that Defendants are not in the military service of the United States

2    and not an infant or incompetent person, and good cause appearing therefore,

3        **IT IS THEREFORE ORDERED, ADJUDGED AND DECREED** that judgment is

4    entered in favor of Plaintiff and against Defendants TALULAH G, INC., a Nevada corporation

5    d/b/a TALULAH G; JOSHUA GRANTZ, an individual; and MEITAL GRANTZ, an individual,

6    jointly and severely, in the sum of **$134,322.02,** which sum is itemized herein below and which

7    sum shall accrue interest at the highest legal rate until satisfied in full.

8        **IT IS FURTHER ORDERED, ADJUDGED AND DECREED**, that said judgment is

9    itemized as follows:

10       1.    For **past due amounts** in the sum of **$87,527.37** for past due rent, past due

11           additional rent, and other charges due and owing as of January 11, 2013, date

12           tenant abandoned space;

13       2.    For **future accrued rent and charges** in the sum of **$37,071.00** accrued as from

14           January 11, 2013, date of abandonment, through September 30, 2013, expiration

15           date of the Lease Agreement, accounting for mitigation of rent received from

16           replacement tenant in the amount of $97,513.23.

17       3.    For an award of **$3,033.32** representing pre-judgment interest at the statutory rate

18           of 5.25% (Wall Street Journal Prime (3.25%) plus 2%) accrued on the outstanding

19           balance from the date of service of process through October 8, 2013.

20       4.    For the sum of **$5,000.00** for reasonable attorneys' fees billed through July 31,

21           2013 in the prosecution of this matter;

22       5.    For the sum of **$1,690.33** for costs and disbursements billed through July 31, 2013

23           in the prosecution of this matter;

24       6.    For post-judgment interest at the highest legal rate accruing on all amounts due

KAEMPFER CROWELL
8345 W. Sunset Rd.
Suite 250
Las Vegas, Nevada 89113

1315046_1.DOCX  11453.228

Page 2 of 3

1    and owing to Plaintiff from entry of judgment until the judgment is satisfied in

2    full;

3    7.    For a reservation of jurisdiction to periodically amend the judgment to revise the

4    future/expectation damages award to reflect the actual amount of Plaintiff's

5    accrued future/expectation damages less any amounts in mitigation received after

6    the hearing on this matter; and

7    8.    For a reservation of jurisdiction to periodically amend the judgment to revise the

8    interest, default interest, late fees, and other amounts accruing, as well as the

9    attorneys' fees/costs damage award if Plaintiff is required to incur additional legal

10    fees and costs after the date of the hearing on this matter.

11    **IT IS SO ORDERED**.

12    Dated this 22nd day of October, 2013.

13

14    DISTRICT COURT JUDGE

15    Submitted By:

16    KAEMPFER CROWELL RENSHAW
     GRONAUER & FIORENTINO
17
     BY:
18    JAMES E. SMYTH II (Nevada Bar No. 6506)
19    ANTHONY J. CELESTE (Nevada Bar No. 8776)
     8345 West Sunset Road, Suite 250
20    Las Vegas, Nevada 89113
     *Attorneys for Plaintiff*
21

22

23

24

KAEMPFER CROWELL
8345 W. Sunset Rd.
Suite 250
Las Vegas, Nevada 89113

1315046_1.DOCX  11453.228

Page 3 of 3